544 F.3d 88 (2008)
UNITED STATES of America, Appellant-Cross-Appellee,
v.
Paul M. COTÉ, Defendant-Appellee-Cross-Appellant.
Docket Nos. 07-1852-cr(L), 07-1949-cr(XAP).
United States Court of Appeals, Second Circuit.
Argued: June 12, 2008.
Decided: September 24, 2008.
*90 Bennett M. Epstein (John W. Mitchell, on the brief), New York, NY, for defendant-appellee Paul Coté.
Michael J. Garcia, United States Attorney for the Southern District of New York (Cynthia K. Dunne, Andrew W. Schilling, Jonathan S. Kolodner, on the brief), New York, NY, for appellant United States.
Before: POOLER and SOTOMAYOR, Circuit Judges, and RESTANI, Judge.[*]
SOTOMAYOR, Circuit Judge:
The government appeals from an April 4, 2007 order of the United States District Court for the Southern District of New York (Brieant, J.), granting the motion of defendant Paul M. Coté for a judgment of acquittal notwithstanding the verdict and conditionally granting Coté's motion for a new trial. Coté cross-appeals the order insofar as it does not dismiss the Indictment on statute of limitations and double jeopardy grounds. Because we find the evidence sufficient to support the jury's verdict upon our de novo review, we hold that the district court erred in granting Coté a judgment of acquittal. We also hold that the district court abused its discretion in conditionally granting Coté a new trial because it: (1) usurped the jury's role in determining witness credibility; (2) improperly concluded that the jury was erroneously instructed; and (3) improperly considered Coté's challenge to a statute of limitations tolling agreement that he had signed. We further hold that Coté's contentions on cross-appeal are without merit, because the record evinces that Coté waived any statute of limitations challenge, and the doctrine of dual sovereignty forecloses his double jeopardy claim.
Reversed and remanded for sentencing.

BACKGROUND
We assume familiarity with the facts of this case, which are set forth more fully in the district court opinion, United States v. Coté, No. 06-cr-0121, 2007 WL 1000849 *91 (S.D.N.Y. Apr.3, 2007), and highlight only the following points here:
Zoran Teodorovic was incarcerated in the Westchester County Jail on October 5, 2000, and placed in the I-G Housing Unit as a pre-trial detainee. The circumstances of Teodorovic's arrest are not entirely clear from the record, but Coté contends and the Government does not state otherwisethat Teodorovic was "arrested after he was discovered inside a private home where he did not belong." Teodorovic was hospitalized on October 10, 2000, after an altercation at the Westchester County Jail with Correction Officers John Mark Reimer and Coté. Teodorovic remained in a coma for the next fourteen months, and died on December 21, 2001.

I. Indictment
Coté was convicted on a single-count Indictment, charging a violation of 18 U.S.C. § 242.[1] The Indictment recites that at all relevant times Coté was employed as a Correction Officer at the Westchester County Department of Correction in Valhalla, New York; that Zoran Teodorovic was a pre-trial detainee in the custody of the Westchester County Department of Correction on October 10, 2000; and that on or about October 10, 2000, Coté, while acting under color of the laws of the State of New York, willfully struck, kicked, stomped, and otherwise assaulted Teodorovic while he was restrained and under the physical control of another Correction Officer (John Mark Reimer), resulting in bodily injury to Teodorovic and willfully depriving Teodorovic of his right to be free from excessive force amounting to punishment by one acting under color of law.

II. Procedural Background
On November 20, 2000, while Teodorovic was still in a coma, the Federal Bureau of Investigation opened an inquiry into whether Coté used excessive force against Teodorovic while assisting Reimer to subdue him on October 10, 2000. By this time, the District Attorney's Office of Westchester County had already obtained an Indictment charging Coté with assault in the first degree (i.e., intentional assault), in violation of Section 120.10 of the New York Penal Law, arising out of the same events. On July 13, 2001, a state jury acquitted Coté of assault in the first degree but convicted him of the lesser-included offense of assault in the second degree (i.e., reckless assault). Coté was sentenced to three months of incarceration, and served two months before being released on November 27, 2001. Teodorovic died the following month.
On May 2, 2002, Coté's then-attorney informed an Assistant United States Attorney ("AUSA") that he had learned that Coté was the subject of a federal inquiry and requested an opportunity to meet with the government for the purpose of avoiding a federal indictment. Nothing transpired until July 14, 2005, when the AUSA was mistakenly notified by the Department of Justice ("DOJ") that the case was *92 being closed. The AUSA advised Coté's attorney of this information. When the DOJ's review of the matter was completed, however, it decided that an indictment should be sought, and United States Attorney for the Southern District of New York Michael J. Garcia concurred in that decision. On October 3, 2005, the AUSA again contacted Coté's counsel to advise him that the government intended to seek an indictment before the five-year statute of limitations period applicable to non-capital offenses of 18 U.S.C. § 242 expired later that week.
On October 6, 2005, Coté, represented by counsel, signed a tolling agreement extending the limitations period by 90 days in order for counsel to meet with federal prosecutors in an effort to persuade them not to seek Coté's indictment. As part of the tolling agreement, the government agreed that it would not seek an indictment alleging that "death resulted" from Coté's acts, which, under § 242, carries a maximum penalty of life imprisonment or death.[2] During the term of the agreement, Coté's counsel met with representatives of the United States Attorney's Office and, after being notified that an indictment would be sought, requested an opportunity to make his arguments to higher-level supervisors within the government to "exhaust all available avenues for internal review of this decision." Because that meeting could not be scheduled before the expiration of the tolling agreement, Coté's counsel offered to extend the limitations period again. Thus, on or about December 8, 2005, the parties entered a second agreement, extending the statute of limitations through February 15, 2006. During the term of this second agreement, Coté's counsel met with United States Attorney Michael Garcia and Assistant Attorney General Wan J. Kim, the head of DOJ's Civil Rights Division. Counsel's efforts were again unsuccessful and the Indictment charging Coté with a violation of 18 U.S.C. § 242 was filed on February 6, 2006.

III. The Government's Case-in-Chief
Trial commenced in federal court on September 11, 2006. The government offered the testimony of four eyewitnesses to the attack: Correction Officer John Mark Reimer, and inmates Gary Sauls, Derrick Turner, and Paul Perez. The government also presented extensive medical testimony, particularly from Teodorovic's initial treating physician, Dr. Deborah Benzil.

A. John Mark Reimer
John Mark Reimer, a Sergeant in the Westchester County Department of Correction, had both state and federal transactional immunity, and had testified as the State's principal witness in the prior state prosecution. Reimer testified that on October 10, 2000, he was on duty as a Correction Officer in the Westchester County Jail and, with Correction Officer Kenneth Meade, was assigned to Cell Block # 1-G, which contained inmates who require more active supervision because they suffer from mental health issues. At approximately 4:30 P.M., Coté relieved Meade for dinner. Coté then assumed Meade's post *93 outside of the cell block. Shortly before 5:00 P.M., Reimer directed two "trustee" inmatesinmates from other parts of the facility who were assigned to observe the persons housed in Cell Block # 1-Gto clean out Teodorovic's cell because it was "unkempt" and Teodorovic had refused to do so. While the trustees were cleaning his cell, Teodorovic stood in the hallway. After the cell cleaning was finished, Reimer, through a loudspeaker from the Security Control Center (the "Bubble"), ordered Teodorovic to return to his cell. When Teodorovic refused to comply, Reimer left the Bubble, approached Teodorovic, and repeated his order. In response, Teodorovic muttered, "no, no, TV." Reimer testified that he instructed Teodorovic to return to his cell, at which point he was unexpectedly "punched" by Teodorovic in his lower cheek area, "hard enough to close [his] jaw and ... [he] bit the inner portion of [his] cheek inadvertently, and it created a little blood blister."
Reimer grabbed Teodorovic with both arms in a "bear hug," and pulled him to the ground. According to Reimer, he did so by bending his knees and using his superior weight to force Teodorovic to the ground. Reimer later testified that he broke their fall with his right hand and that he did not see Teodorovic's head strike the floor, but acknowledged on cross-examination that he had testified during the state prosecution that Teodorovic's head "may have bounced" on the ground during his initial take-down. He also explained that he was kneeling above Teodorovic "at the waist area, in the middle of his body," and that Teodorovic's left hand was underneath his body and his right hand was free, "which [he] was holding down." Reimer stated that Teodorovic was "wiggling, appeared to be struggling, appeared uncomfortable."
According to Reimer, at this point, "Officer Coté came up along side [of him] and he began to punch ... Teodorovic in the chest and the head." He recalled two punches to the head, two punches to the chest, and one slap to the rear of the chest area. The punches were with a closed fist and the slap was open-handed. After Reimer said "enough," Coté got up to his feet and began to kick Teodorovic in the chest area and then in the head. Reimer described two direct kicks to the chest, one direct stomp to the face, and two direct kicks to the face. At the same time, Reimer testified that Coté was yelling at Teodorovic, "`You never hit an officer. You never hit an officer. Don't you ever hit a Correction Officer again.'" But Reimer was yelling at Coté to stop:
Q: What, if anything, did you say to the defendant while he was kicking and stomping Mr. Theodorovic [sic]?
A: I said, "Paulie, Paulie, Paulie. Stop, Paulie. What are you doing?
And I justI looked at him and I said, "Paulie." I remember saying "Paulie" about three times, yelling at him, trying to get his attention to stop, and it didn't look like I was getting through to him.
Although Teodorovic was "still wiggling" during this application of force by Coté, he soon stopped moving and lost consciousness. He remained in a coma for approximately fourteen months, until he died on December 21, 2001.
Reimer testified that immediately following the assault he saw Coté filling out a Special Report, which is a standardized form used by officers to document unusual incidents. Coté's Special Report diverged from Reimer's account of the incident in a number of ways. For example, Coté claimed that both he and Reimer pulled Teodorovic to the ground and while they *94 were "wrestling" Teodorovic's head hit the ground. According to Reimer, Coté approached him while he was at the hospital's emergency room to seek treatment for his wrist injury and urged him to "[stick] to the story that was documented in his report." Reimer testified that although he initially went along with Coté and dictated his Special Report to track Coté's, he changed his mind after learning that Teodorovic was "brain dead" and decided to contact an attorney and cooperate in the state investigation into the incident.

B. Gary Sauls
During the assault, inmate Gary Sauls was in his cell at the other end of the cell block. A small crackbetween 3/8"-5/8" existed between the door of his cell and the wall. Sauls testified that he was looking through the crack watching the action down by the first four or five cells, about 65 to 75 feet away. He saw Reimer reach out to touch the inmate and, in response, Teodorovic "threw his hands up," possibly striking Reimer in the face. Sauls then saw Reimer grab Teodorovic in a bear hug, spin him around, and slam him to the floor, with Teodorovic's hands pinned to his sides. According to Sauls, Teodorovic struck the floor "on an even plane," with his head pointing toward the Bubble and away from Sauls. When Teodorovic was on the ground, Sauls saw Reimer kneeling over him with his hands on him "to restrain him, to hold him down." Sauls testified that while Reimer was holding Teodorovic down, he saw Coté run to the scene and kick Teodorovic in the face. After that kick, Coté "bent down and he started beating [Teodorovic] with his fist. He hit him in the face. He hit him in the head. He hit him in the shoulder, in the back." "Then, after he was beating on him, then he got up and he started stomping him." Sauls characterized Coté's demeanor as "out of control," and recalled Coté cursing, saying "`Don't you ever, you stupid mother fucker.'" Although Sauls did not quantify the number of kicks and stomps he observed when he testified on direct examination, he was confronted on cross-examination with a statement he had given investigators on the day of the incident, in which he said, "The officer stomped the inmate's head into the floor approximately 15 to 17 times." Sauls agreed that his estimate "could have been accurate," adding, "[o]ne was too many times."

C. Paul Perez
Paul Perez, one of the inmate trustees who swept out Teodorovic's cell, testified that he was standing five to seven feet away when the assault occurred. Perez recounted that, after he cleaned out Teodorovic's cell, Reimer used the loudspeaker to order Teodorovic back into his cell. When Teodorovic remained standing outside of his cell, Perez testified that Reimer entered the cell block and approached Teodorovic "to escort him back into the ... cell," at which point Teodorovic "sucker punched him, like up, right. The guy sucker punched him, and that's when Officer Reimer grabbed him and he tried to put him on the floor."
Perez testified that, at this point, Reimer was "on top of the inmate, trying to hold him." According to Perez, Coté then entered and began striking Teodorovic with his hands and using his feet to stomp him repeatedly on the head. When Teodorovic attempted to lift up his head in response to the kicks, Coté "kicked it right back down" and Perez could "feel the vibration on the floor." Perez described the intensity of the kicks as "real hard," and recounted that Coté was yelling at Teodorovic as he stomped him: "You stupid mother fucker, what is wrong with you? Don't you know we're fucking COs? What, are you stupid?"
*95 On direct examination, Perez testified that Coté kicked Teodorovic "a lot of times," but he did not know precisely how many times. When pressed to quantify the number on cross-examination, Perez offered that it was "several" times and "could have been from nine to ten, you know, or more." When asked for his "best guess" as to how long the stomping continued, Perez estimated "like fifteen, twenty minutes."

D. Derrick Turner
Derrick Turner was also working on Cell Block # 1-G as a paid inmate trustee, assigned to keep an eye on inmates thought likely to commit suicide. Turner estimated he was standing about ten feet from Teodorovic at the time of the incident. Turner testified that after Teodorovic "took a swing at him," Reimer grabbed Teodorovic and "held him down to the ground, so that he would subdue him." Turner explained that Coté then ran into the cell block and, using both hands, "more or less grabbed this guy and slammed his head into the ground and [then] he started stomping him." Turner testified that "[i]t was so hard you could feel the vibration." Turner also recalled Reimer telling Coté "to calm down or something," but Coté was shouting at Teodorovic: "`That's what you get for messing with a correction officer,' or something like that."
On cross-examination, Turner stated that Coté stomped Teodorovic's head "several times." When asked to give a more specific number, Turner estimated the number of stomps to be between two and seven. He also claimed that before Coté began stomping on Teodorovic, Reimer punched Teodorovic a "few times" while on the ground, and they were "tussling" with each other.

E. Deborah Benzil
Dr. Deborah Benzil, the Director of Neurotrauma at the Westchester County Medical Center, was the neurosurgeon on call who examined and treated Teodorovic. At trial, she testified about the injuries she observed and the treatment Teodorovic received. Further, as an expert in the fields of neurosurgery and neurotrauma, she provided testimony concerning the nature and extent of Teodorovic's injuries, the cause of those injuries, and the degree of force necessary to cause similar injuries.
According to Benzil, Teodorovic suffered extensive external and internal injuries to his face and head. This included "extensive bruising" behind the left eye and on the right cheek, abrasions and lacerations on Teodorovic's head, blood in his right ear, "extensive swelling" on "both sides" of the back of his head, and multiple fractures in several areas. With respect to causation, Benzil testified that Teodorovic's injuries could not have been sustained from a single fall to the ground. Rather, she opined that Teodorovic's head injuries resulted from multiple blows, at least some of which required the application of significant force. In support, Benzil explained that the diffuse nature of the injuries indicated that Teodorovic suffered separate and independent blows to multiple sides of his face and head. Benzil also explained that it was unlikely Teodorovic's injuries were caused by a single blow because, when people fall to the ground, "they're not going to have the head hit first" instinctively to protect it from being struck.
Finally, Benzil testified about the degree of force necessary to cause injuries similar to Teodorovic's. She explained that the amount of force for each of Teodorovic's independent injuries varied. For instance, the force needed to break a facial bone was more than that needed to cause external swelling at the back of the head. The *96 force needed to break the bones deep within Teodorovic's skull was "very significant" and similar to that resulting from being "catapulted off a motorcycle," striking a windshield at a "significant speed," or being assaulted "with a heavy object multiple times."[3]

IV. The Defense's Case
The defense argued that Teodorovic's injuries were caused not by Coté, but by Reimer when he restrained Teodorovic by grabbing him around the waist and brought him forcefully to the concrete floor, knocking his head against the ground. The defense also implied that Reimer cooperated with the State authorities so as to immunize himself from liability when, in fact, he was responsible for Teodorovic's most severe injuries.
During trial, the defense did not call any fact witnesses; rather, the defense called two experts in brain injury, Dr. Scott Shepard and Dr. Vernon Armbrustmacher. Both testified that it was their opinion that all of Teodorovic's injuries were caused when Reimer swung him down to the ground and his head hit the concrete floor of the cell block. Shepard explained that when Teodorovic's head bounced off the concrete floor, it caused what is known as a closed head "coup/contrecoup" injury, in which sudden deceleration of the skull causes the brain to bounce off of the skull's interior. The "coup" injury is caused by the initial impact to the brain and the "contrecoup" is caused by the brain bouncing off the opposing side of the skull. In this way, an individual having a single impact fall could suffer injuries on both sides of the brain from a single fall. Armbrustmacher's testimony was substantively similar.

V. Pre-Trial Motion, the Jury's Verdict, and Post-Trial Motions
At the conclusion of the evidence, on September 18, 2006, Coté moved pursuant to Rule 29(a) of Federal Rules of Criminal Procedure for a judgment of acquittal, arguing that the evidence was insufficient to support a conviction. The district court denied the motion. On September 20, 2006, after deliberating for less than one day, the jury returned a verdict of guilty. Coté then moved pursuant to Rules 29(c) and 33 of the Federal Rules of Criminal Procedure for a judgment of acquittal and, alternatively, a new trial. On April 4, 2007, the district court granted Coté a judgment of acquittal and conditionally granted him a new trial in the event that the judgment of acquittal was reversed.

A. Judgment of Acquittal
In granting the Rule 29 motion, the district court rejected each of the government's main witnesses on credibility grounds. Despite acknowledging the "limited role of the Court in determining credibility in the context of [Rule 29] motions," Coté, 2007 WL1000849, at *9, the court concluded that "[t]he inmate testimony during trial was so exaggerated and vindictive as to be entirely incredible as a matter of law to the extent that it differs from Reimer's testimony," id. at *11. The court found it was "compelled to conclude that Saul's [sic] testimony was blatantly untrue" because "Teodorovic's face could not possibly have been stomped on in the manner and as many times as Sauls claimed, and the photographs of him in *97 evidence confirm the exaggeration." Id. at *8. While the court was "unprepared to state that the prosecutors presented a witness that they knew would be a liar as to the events which he claimed he saw through a 3/8"-5/8' crack between the door and the wall, a fair-minded jury would have disregarded Sauls' testimony in its entirety, and he should not testify if a new trial is held." Id.
With regard to Perez, the district court began by noting that "[t]his convicted pederast had a long criminal record," before determining that he, too, had "exaggerated the number of stomps" because his testimony was inconsistent with Reimer's testimony and with the photographs of Teodorovic's face. Id. at *9. The district court also found incredible Perez's testimony as to the duration of the assault and concluded: "Perez, like Sauls, was grossly exaggerated, most likely out of malice, and the credibility and weight to be given to his testimony is at best highly questionable." Id. The court further observed that Turner's testimony was questionable on the ground that he was a "convicted felon" who had inaccurately placed the location of the assault and who was alone in claiming that Reimer punched Teodorovic while they were "tussling" on the ground. Id.
Apart from the inmate witnesses' testimony, the court found Reimer's testimony was "suspect" because Reimer was "evasive," had "seventeen hours of rehearsal time with the Government," and "attempted [to] deviat[e] from his testimony in the prior state trial." Id. at *7. The court explained that "Reimer's testimony alone raises sufficient reasonable doubt as to what injuries were inflicted by himself and what injuries, if any, were inflicted by Coté after Reimer had restrained and controlled the prisoner." Id. at *11. The court clarified, "it cannot be fairly concluded on the totality of the testimonial and other evidence that it was Mr. Coté's applications of force, rather than the initial blow to Mr. Teodorovic's head imposed by Reimer's act in taking him down, that caused the [undisputed] brain trauma." Id.
Finally, the district court ruled that the evidence was insufficient to support a finding that Coté acted with the requisite intent. It explained:
The State Court jurors got it right when they refused to find criminal intent on a nearly and materially identical record, and were probably right in their verdict that Coté recklessly used more force than hindsight suggests was necessary. This reckless misconduct, for which the state has convicted and punished Coté, does not rise to the level of a violation of [18] U.S.C. § 242.
Id.

B. Conditional Grant of a New Trial
In the alternative, the district court granted Coté a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure. The court reasoned that it was "not satisfied that competent, satisfactory and sufficient evidence in the record supported the jury's finding of guilt beyond a reasonable doubt." Id. In reaching this conclusion, the court referred to its earlier evaluations of the evidence and noted that because "much of the testimony was patently incredible and defied physical realities portrayed in the photographs," there was a "real concern that an innocent person may have been convicted." Id.
The court also sua sponte held that the jury had not been properly charged on the issue of whether there was intentional criminal conduct in conformity with the facts of the Indictmentnamely, intentional criminal conduct by Coté after Teodorovic was restrained and under Reimer's controland that the defendant should *98 therefore be acquitted or granted a new trial to prevent a "manifest injustice." Id. at *14. According to the district court, "[c]onsidering the totality of the circumstances and the evidence adduced at trial tending to suggest, if not confirm, that Teodorovic was not under control when Coté applied force, a serious injustice resulted, as it is entirely possible, if not probable, that a jury would not have convicted if adequately instructed that a conviction must conform to the factual and legal allegations of the indictment." Id. at 13.
Further, the court found that the circumstances surrounding the execution by Coté and his counsel of the first statute of limitations tolling agreement were "inherently coercive." Id. at 14. For these reasons, the court concluded that, should Coté not be entitled to a judgment of acquittal, he "is at least entitled to a new trial." Id. at 20.
The government timely appealed the order, and Coté cross-appealed insofar as the court did not dismiss the Indictment on statute of limitations and double jeopardy grounds.

DISCUSSION
The government's appeal presents two main issues: first, whether the district court erred by granting Coté's motion to set aside the jury's verdict under Rule 29(c); second, whether the court abused its discretion by conditionally granting Coté's motion for a new trial under Rule 33. We hold that the district court erred in both respects.

I. Judgment of Acquittal
The government argues that the district court erred in granting Coté's motion for a judgment of acquittal on the ground that the trial evidence was insufficient as a matter of law to support the jury's guilty verdict. See Fed.R.Crim.P. 29(c). We review de novo a district court's grant of a Rule 29 motion, applying the same standard of sufficiency as the district court. United States v. Jackson, 335 F.3d 170, 180 (2d Cir.2003). That standard imposes a heavy burden on the defendant, whose conviction must be affirmed if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). In assessing sufficiency, we view the evidence in the light most favorable to the government, and we draw all reasonable inferences in its favor. United States v. Puzzo, 928 F.2d 1356, 1361 (2d Cir.1991). Furthermore, we consider the evidence in its totality, not in isolation, and the government need not negate every possible theory of innocence. See United States v. Rosenthal, 9 F.3d 1016, 1024 (2d Cir.1993). Applying these principles, we agree with the government that the district court erred in granting Coté a judgment of acquittal following the jury's verdict of guilty.
For the jury to convict Coté of violating Teodorovic's right to be free from excessive force, it had to find that he: (1) acted under color of law; (2) used excessive force amounting to punishment; (3) acted willfully; and (4) caused bodily injury. United States v. Walsh, 194 F.3d 37, 47 (2d Cir.1999); cf. United States v. Livoti, 196 F.3d 322, 327 (2d Cir.1999) (stating elements of excessive force claim under Fourth Amendment). That Coté was acting under color of law at all relevant times has never been disputed. Thus, the issue is whether the government produced sufficient evidence for a rational juror to conclude that the remaining three elements of the statute had been proven beyond a reasonable doubt. Upon review *99 of the record, we find that a rational juror could so conclude.

A. Excessive Force
As this Court explained in United States v. Walsh, 194 F.3d 37 (2d Cir.1999), the factors that a jury may consider in deciding whether force used against an inmate was excessive include "the need for the application of force, the relationship between the need and amount of force that was used, the extent of the injury inflicted, and whether the force was applied in a good-faith effort to restore discipline or sadistically for the purpose of causing harm." Id. at 47. Here, four eyewitnesses testified that Coté viciously assaulted Teodorovic while he was lying on the ground, already in a position of weakness: Reimer testified that, while he was holding Teodorovic on the ground, Coté ran into the cell block and punched, kicked, and stomped on Teodorovic. Sauls testified that, while Reimer was holding down Teodorovic, Coté ran over, beat him with his fists, and kicked him in the face. Perez testified that Coté came into the cell block while Reimer was "on top" of Teodorovic and stomped and kicked him in the head "real hard," multiple times. And Turner, standing just ten feet away, testified that, while Reimer held Teodorovic on the ground, Coté ran in from the corridor, slammed Teodorovic's head into the ground, and repeatedly kicked him in the head. Even if, as the district court suggests, the jury were to find that Coté had a duty to aid Reimer to subdue the inmate, see Coté, 2007 WL 1000849, at *10, viewing the evidence in the light most favorable to the government, see Guadagna, 183 F.3d at 125, this evidence would plainly allow a reasonable juror to determine that Coté used excessive force in trying to secure Teodorovic.
In arriving at its contrary conclusion, the district court reasoned that "[t]he inmate testimony during trial was so exaggerated and vindictive as to be entirely incredible as a matter of law to the extent that it differs from Reimer's testimony." Coté, 2007 WL 1000849, at *10. The court focused in particular on the discrepancy between the inmates' testimony and the photographs admitted into evidence, reasoning that "the repeated stomping alleged by most of the Government witnesses, in contrast to the one stomp asserted by Reimer, would have rendered Mr. Teodorovic unrecognizable." Id. at 11. To the extent the inmate witnesses' testimony on the number of stomps and kicks to Teodorovic was inconsistent, however, the jury was entitled to reject the extremes of the testimony and conclude that the truth lay somewhere in between. See Romano v. Howarth, 998 F.2d 101, 107 (2d Cir.1993) ("The truth, however, may, and often does, lie somewhere in between the divergent accounts [of witnesses]; the jury's discretion to explore the middle ground should have remained unfettered. In this case, for example, the jury could have rejected the defendants' version that no force was used, but also have rejected many of the details described by [the plaintiff].").
Further, it is well settled that "Rule 29(c) does not provide the trial court with an opportunity to substitute its own determination of ... the weight of the evidence and the reasonable inferences to be drawn for that of the jury." United States v. Guadagna, 183 F.3d 122, 129 (2d Cir.1999) (internal quotation marks omitted). The court must give full play to the right of the jury to determine credibility, and must draw all possible inferences in favor of the government. Id. Accordingly, the district court here was not entitled to reject the bulk of the government's evidence as not credible for purposes of *100 granting Coté's Rule 29 motion. The purported inconsistencies that troubled the district court, and the inferences to be drawn from the photographic evidence, are factors relevant to the weight the jury should accord to the evidence, and do not on this record justify the grant of a judgment of acquittal. See United States v. Florez, 447 F.3d 145, 156 (2d Cir.2006) ("We will not attempt to second-guess a jury's credibility determination on a sufficiency challenge."); United States v. Cunningham, 723 F.2d 217, 223 (2d Cir.1983) ("[A] trial judge [is] not entitled to set aside [a] guilty verdict simply because he would have reached a different result if he had been the fact-finder.").

B. Specific Intent
The next question is whether the evidence was sufficient to establish that Coté willfully deprived Teodorovic of his right to be free from excessive force, or whether, as the district court found, Coté lacked the requisite intent to be convicted under the statute. See Coté, 2007 WL 1000849, at * 11. As a preliminary matter, the nature of the force itselfrepeatedly striking and kicking Teodorovic in the head suggests that Coté intended to injure him rather than simply to restrain him. There is also evidence that, after the attack, Coté falsified his incident report and attempted to persuade Reimer to "[stick] to the story." Such deception supports an inference that Coté knew the force he used was excessive.
In addition, the words Coté used as he beat Teodorovic betrayed his willful intent and belied any possibility that he was engaged in a good-faith effort to restrain the inmate. Although the eyewitnesses' recollections differed regarding the precise words used, all of them testified that Coté yelled words of punishment at Teodorovic. (Reimer: "You never hit an officer. You never hit an officer. Don't you ever hit a correction officer again."); (Sauls: "Don't you ever, you stupid mother fucker."); (Perez: "He was saying, `You stupid mother fucker, what the fuck is wrong with you?'"); (Turner: "He said something to the inmate, like `that's what you get for messing with a Correction Officer.'"). Sergeant Gannon, who arrived moments after the attack, independently corroborated these accounts, testifying that he witnessed an "agitated" Coté yelling profanities at Teodorovic: "You better fuckin' respect officers, you shithead." When viewed in the light most favorable to the government, see Puzzo, 928 F.2d at 1361, this evidence is sufficient for a rational juror to conclude beyond a reasonable doubt that Coté acted with the criminal intent required to support his conviction.[4]

C. Bodily Injury
To satisfy the "bodily injury" element of an 18 U.S.C. § 242 charge, we have explained that "even if the victim does not suffer `serious' or `significant' injury, [this factor is met] as long as the amount of *101 force used is not de minimis." Walsh, 194 F.3d at 50 (internal citations omitted). In this case, all medical experts who testified agreed that Teodorovic endured significant injury as a result of the incident. As the district court observed, "[t]here is no serious dispute that Mr. Teodorovic suffered head injury and brain trauma." Coté, 2007 WL 1000849, at *11. In light of our determination that the jury could have found the amount of force used was excessive, the injuries suffered by Teodorovic satisfy the degree of harm required.
The remaining question is whether Coté caused this injury. On this point, the government contended, and the jury apparently believed, that Coté exerted significant and repeated force to cause Teodorovic's head injuries and brain trauma. Coté presented his own medical evidence that attacked the government's theory and argued that Teodorovic's most severe injuries were caused only by Reimer, and the district court concluded that the latter evidence established reasonable doubt as a matter of law. Id. at *10. Nevertheless, the jury was entitled to weigh the conflicting evidence and to credit either account. See Guadagna, 183 F.3d at 129.
In sum, considering the totality of the evidence in the light most favorable to the government, we believe a rational juror could find Coté guilty of willfully violating Teodorovic's constitutional right to be free from excessive force given the circumstances. We therefore hold that the district court erred in granting the motion for acquittal.

II. Motion for New Trial
By way of alternative relief, the district court conditionally granted Coté's motion for a new trial pursuant to Federal Rule of Criminal Procedure 33. It did so on the grounds that the witness testimony was incredible, the jury was improperly charged, and the parties' agreement to toll the statute of limitations was invalid. Coté, 2007 WL 1000849, at * 14-15. While we generally allow district courts greater deference to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29, courts must nonetheless exercise Rule 33 authority "sparingly" and in "the most extraordinary circumstances." Sanchez, 969 F.2d at 1414. Because this case does not present such "extraordinary circumstances," id., we hold that the district court erred in exercising its discretion to grant Coté a new trial.
We review the grant of a new trial for abuse of discretion. United States v. Scotti, 47 F.3d 1237, 1241 (2d Cir.1995). "[T]he court may grant a new trial to [a] defendant if the interests of justice so require." Fed.R.Crim.P. 33; see also United States v. Landau, 155 F.3d 93, 104 (2d Cir.1998) (noting that a new trial is proper when a district court "is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice" (quoting Smith v. Lightning Bolt Prods., Inc., 861 F.2d 363, 370 (2d Cir.1988)) (internal quotation marks omitted)). In the exercise of its discretion, the court may weigh the evidence and credibility of witnesses. Sanchez, 969 F.2d at 1413. At the same time, the court may not wholly usurp the jury's role: "It is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment." Id. at 1414. An example of exceptional circumstances is where testimony is "patently incredible or defies physical realities," although the district court's rejection of trial testimony by itself does not automatically permit Rule 33 relief. Id. In this case, although the district court accurately cited these standards, it failed to follow them in its analysis.
*102 First, the district judge erred by discounting the testimony of the inmate witnesses as "patently incredible" or testimony that "defies physical realities portrayed in the photographs." Coté, 2007 WL 1000849, at *14. While it is true that the testimony of each inmate differed with regard to the number of times Coté stomped on Teodorovic, all agreed that there was a struggle, with Reimer bringing Teodorovic to the ground and Coté kicking, punching, or stomping on Teodorovic a number of times. All agreed that Coté approached and began assaulting Teodorovic while he was being held down by Reimer. All agreed that, while he was kicking Teodorovic, Coté was shouting at him to respect his authority as a Correction Officer, and Reimer, Sauls, and Turner agreed that Coté's demeanor was angry. Coté's shouting was also independently confirmed by the responding officer to the scene, Sergeant Gannon. Furthermore, although the district court discredited Sauls's testimony in part because the court doubted he could have witnessed the events through a 3/8"-5/8" crack, see Coté, 2007 WL 1000849, at *8, Warden O'Neill testified that he personally had verified that someone in Sauls's cell could, in fact, see the area where the assault occurred, and the defense conceded in its summation to the jury that the Warden's testimony in this regard was correct. Consequently, none of the testimony in this case was incredible as a matter of law. Rather, the differences in testimony presented a question of credibility for the jury. Sanchez, 969 F.2d at 1415.
With regard to the district court's conclusion that the inmates' testimony "defie[d] physical realities portrayed in the photographs," we note that Benzil testified that the photographs did not fully comport with her medical assessment of Teodorovic at the time she examined him. A jury could reasonably find her opinion to be supported by the CAT scans received into evidence, which, according to Benzil, showed massive internal injuries to Teodorovic's skull and brain, multiple fractures, and swelling. Benzil explained that certain of these injuries were not apparent on the surface and thus could appear in a CAT scan without appearing in photographs. The district court did not address this evidence, apparently making no independent evaluation of Benzil's testimony. The court therefore not only failed to examine the entire case, see Sanchez, 969 F.2d at 1414, but it also substituted its own layman's view of the photographs for the jury's assessment of the evidence, see Autuori, 212 F.3d at 120 (noting that the district court must strike a balance between weighing the evidence and credibility of witnesses and not "wholly usurp[ing]" the jury's role).
Second, we disagree with the district court's sua sponte conclusion that the jury was improperly instructed on the issue of whether there was intentional criminal conduct by Coté after Teodorovic was restrained and under Reimer's control. It is well settled that where the government alleges facts in the Indictment that are not elements of the statutory offense, such additional allegations need not be proven at trial. See Autorino, 381 F.3d at 54; United States v. Richards, 302 F.3d 58, 67 n. 6 (2d Cir.2002) (the government "need not prove allegations of an indictment that are `surplusage' to the essential elements of the offense charged"). Here, whether Teodorovic was restrained and under control when Coté inflicted the injury was not an element of the offense, as the district court acknowledged. Coté, 2007 WL 1000849, at *13 ("This deficiency goes to a fundamental component of the specific criminal act charged, although not to the legal elements of the crime qua crime."). Thus, it was not necessary to charge the *103 jury regarding those alleged facts. Moreover, viewing the charge as a whole, see United States v. Carr, 880 F.2d 1550, 1555 (2d Cir.1989), we see no reversible error. The district court instructed the jury that it should consider the extent to which Teodorovic was restrained by Reimer as one factor relevant to whether the force was intentionally excessive:
You heard Captain Ehren testify that when an inmate is wrestling with one of the other officers, that a correction officer may use as much force as is necessary to stop the inmate from becoming a threat and that such decisions are often split second decisions.
. . .
In deciding whether the force applied in this case was excessive and therefore constituted a deprivation of a constitutional right, you should consider all the circumstances surrounding the incident and known to Mr. Coté at the time he acted. Among the factors that you consider are the conditions giving rise to a need for use of force, the relationship between the need for force and the amount of force used, the extent of the injury that was inflicted, and whether the force was applied in a good faith effort to protect Mr. Reimer from injury, or to compel Mr. Teodorovic to return to his cell, or maintain and restore discipline, or in bad faith for no legitimate purpose.
The court likewise instructed the jury that while "[t]he injury need not be significant, severe or permanent in order to satisfy this element[,] ... the injuries have to be the result of the defendant's misconduct." By explaining both that bodily injury must have occurred and that the injuries must have been caused by Coté, the district court accurately conveyed the extent of the law and thus no error resulted.
Finally, the district court erred in ruling that the purported involuntariness of Coté's waiver of the statute of limitations provided an additional ground for a new trial. Although we cannot condone the government's three year delay in indicting Coté, much less its confused communications with him, we disagree that the government's request to toll the statute of limitations shortly before it expired was necessarily coercive. Without the agreement, Coté would have remained vulnerable to prosecution for a death-eligible violation of Section 242, because there is no period of limitations for that charge. 18 U.S.C. § 3281. The tolling agreement merely replaced that possibility with continued exposure to less serious charges. Moreover, Coté did not assert a statute of limitations defense at or before his trial. When the district court raised the issue at a pretrial conference, Coté's counsel represented that he was not making such a claim. And Coté obtained benefits from the agreement: first, by obtaining a meeting with federal prosecutors so that he might persuade them not to file charges; by securing a guarantee that he would not be charged with a death-eligible violation of Section 242; and then by successfully arguing to the district court that the agreement precluded the government from even mentioning Teodorovic's death, much less arguing that Coté had caused it. Only after obtaining these benefits but nevertheless being found guilty did Coté contest the validity of the agreement. Accordingly, Coté's statute of limitations defense was waived at the time the district court ruled on the Rule 33 motion. See Walsh, 700 F.2d at 855-56 (explaining that a statute of limitations defense is not jurisdictional but is an affirmative defense that may be forfeited or waived); United States v. Thurston, 358 F.3d 51, 63 (1st Cir.2004) ("Waiting until after the jury has rendered a verdict of guilt to raise a limitations *104 defense for the first time is inconsistent with the characterization of the statute of limitations as an affirmative defense and would unfairly sandbag the government.").[5]
In view of the foregoing, we do not believe this is the kind of exceptional case in which a new trial is warranted. To the contrary, we conclude that the jury's determination of guilt was amply justified and that the district court abused its discretion in granting a new trial.

III. Coté's Cross-Appeal
Coté cross-appeals the district court's decision to the extent it fails to dismiss the Indictment against him on statute of limitations and double jeopardy grounds. Both contentions are meritless. As previously discussed, Coté waived his statute of limitations defense by failing to raise the issue prior to or during his trial. In addition, as Coté acknowledges, we are constrained by Supreme Court precedent to conclude that his conviction does not violate his constitutional protection against double jeopardy because of the doctrine of dual sovereignty. See United States v. Sewell, 252 F.3d 647, 651 (2d Cir.2001) (holding "a defendant in a criminal case may be prosecuted by more than one sovereign without violating any principles of double jeopardy").[6] Finally, we need not devote extensive discussion to Coté's contention that he is entitled to relief because of an alleged violation of the government's "Petite" policy. This policy precludes the initiation or continuation of a federal prosecution following a prior state or federal prosecution based on substantially the same acts or transactions, absent a finding that the prosecution serves "compelling interests of federal law enforcement." Thompson v. United States, 444 U.S. 248, 248, 100 S.Ct. 512, 62 L.Ed.2d 457 (1980) (internal quotation marks omitted). We have squarely held that the Petite policy "affords defendants no substantive rights." United States v. Catino, 735 F.2d 718, 725 (2d Cir.1984). Rather, that policy "is merely an internal guideline for exercise of prosecutorial discretion, not subject to judicial review." United States v. Ng, 699 F.2d 63, 71 (2d Cir.1983). Accordingly, Coté may not invoke the Petite policy as a bar to his federal prosecution.

CONCLUSION
For the foregoing reasons, the order of the district court setting aside the jury verdict of guilty and granting a new trial is reversed, and the case is remanded for sentencing.
NOTES
[*] The Honorable Jane A. Restani, Chief Judge of the United States Court of International Trade, sitting by designation.
[1] Section 242 provides:

Whoever, under color of any law, statute, ordinance, regulation or custom willfully subjects any person in any State, Territory, Commonwealth, Possession or District to a deprivation of any rights, privileges or immunities secured or protected by the Constitution or laws of the United States ... shall be fined under this title or imprisoned not more than one year, or both; and if bodily injury results from the acts committed in violation of this section ... shall be fined under this title or imprisoned not more than ten years, or both; and if death results from the acts committed in violation of this section ... shall be fined under this title or imprisoned for any term of years or for life or both, or may be sentenced to death.
[2] Because Coté had already been tried by the State of New York, before Teodorovic died, this agreement eliminated any risk that Coté might be charged with Teodorovic's death. Moreover, Judge Brieant relied on this agreement during Coté's federal trial to rule that evidence of Teodorovic's death could not be introduced at all, because "it does set kind of an inappropriate and a shocking tone for a case that really does not involve a charge of homicide and a statute which really does not require significant bodily injury to be violated...."
[3] In addition to the eyewitness and medical testimony, the government called three other Correction Officers at trialSergeant Christopher Gannon, Captain James Osario, and Captain Fred Ehrenas well as the Warden of Westchester County Department of Correction, John O'Neill. We address this testimony throughout the opinion when relevant.
[4] We note that the district court's reliance upon the fact that the state court jury acquitted Coté of intentional criminality on a nearly identical record is not permitted by our precedent, which establishes that a district court may not use a jury's verdict in another case to reject the jury's verdict in the case under review. See United States v. Sanchez, 969 F.2d 1409, 1415 (2d Cir. 1992). Also, the district court had no grounds to conclude that the state and federal juries considered the same body of evidence because the complete record of the state trialincluding Coté's testimonywas not before the district court. Coté, 2007 WL 1000849, at *11 (noting that "[t]he State Court jurors got it right when they refused to find criminal intent on a nearly and materially identical record, and were probably right in their verdict that Coté recklessly used more force than hindsight suggests was necessary").
[5] Under Federal Rule of Criminal Procedure 12(b)(1), a defense based on "defects in the institution of the prosecution" must be raised before trial. Thus, any argument that the government secured the tolling agreement through coercion fares no better. Cf. United States v. Taylor, 562 F.2d 1345, 1355 (2d Cir.1977) (finding defense of selective prosecution waived because it was not raised prior to trial).
[6] There are limited exceptions to this doctrine, which the district court found inapplicable and which Coté does not pursue on appeal. See Bartkus v. Illinois, 359 U.S. 121, 123-24, 79 S.Ct. 676, 3 L.Ed.2d 684 (1959) (recognizing an exception to the dual sovereignty doctrine where "one of the sovereigns effectively controlled the other, and the subsequent prosecution was merely a sham").