**11-784-cr**
**United States v. Truman**

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

August Term, 2011

(Argued:  March 12, 2012       Decided: July 25, 2012)

Docket No. 11-784-cr

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA,

Appellant,

v.

JEFFREY E. TRUMAN, SR.,

Defendant-Appellee.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Before: LIVINGSTON, LOHIER, Circuit Judges, and RAKOFF, District Judge.*

The Government appeals from the District Court's judgment of acquittal under Federal Rule of Criminal Procedure 29(a) and its conditional grant of a new trial under Federal Rules of Criminal Procedure 29(d) and 33(a) after a jury trial in which Jeffrey E. Truman, Sr. was convicted of arson, wire fraud, and use of fire in the commission of a felony.  We conclude that the District Court erred in granting the judgment of acquittal and conditionally granting a new trial.  We therefore vacate the District Court's judgment of acquittal and its conditional grant of a new trial, and we remand the case with instructions to reinstate the jury's verdict and enter a judgment of conviction.

---

* The Honorable Jed S. Rakoff of the United States District Court for the Southern District of New York, sitting by designation.

STEVEN D. CLYMER, Assistant United States Attorney (Edward R. Broton, Gwendolyn E. Carroll, Assistant United States Attorneys, on the brief), for Richard S. Hartunian, United States Attorney, Northern District of New York, for Appellant.

EDWARD Z. MENKIN, Syracuse, N.Y., for Defendant-Appellee.

LOHIER, Circuit Judge:

The Government appeals from a judgment issued by the United States District Court for the Northern District of New York (Hurd, J.) granting Defendant-Appellee Jeffrey E. Truman, Sr.'s ("Truman") motion for a judgment of acquittal under Federal Rule of Criminal Procedure 29(a) and conditionally granting Truman's motion for a new trial under Federal Rules of Criminal Procedure 29(d) and 33(a) after a jury trial in which Truman was convicted of various arson-related charges in connection with the destruction by fire of a vacant building that he jointly owned. A principal witness against Truman at trial, his son, Jeffrey Truman, Jr. ("Truman, Jr."), had been convicted in New York state court of setting fire to the building and had thereafter cooperated with the federal Government.

Contrary to the District Court's analysis, we conclude that Truman, Jr.'s refusal to answer certain questions at trial did not render his testimony for the Government "incredible as a matter of law," and that Truman, Jr.'s prior testimony against Truman in a separate state court trial was properly admitted as nonhearsay under Federal Rule of Evidence 801(d)(1)(A). We also conclude that Truman was not prejudiced by the Government's improper cross-examination and arguments in summation or by the Government's reference in summation to a breach of Truman, Jr.'s cooperation agreement. Accordingly, we vacate the District Court's judgment of acquittal and its

2

order conditionally granting a new trial, and we remand for entry of a judgment consistent with the jury's guilty verdict and for sentencing.

## BACKGROUND

According to the evidence introduced at trial, in November 2005 Truman, along with two partners in JMM Properties, LLC ("JMM"), purchased a vacant commercial building and the property on which it was located on Liberty Street in Oneida, New York ("Liberty Street building" or "the building") for $175,000. An insurance policy for the property, set to expire November 17, 2006, covered up to $4,250,000 in fire-related losses. Moreover, as Truman later learned from JMM's real estate broker, the property without the building "was worth as much or more than it was worth with the building on it."

In January 2006 a small fire started accidentally at the Liberty Street property, causing only minor damage. The day after the fire, the real estate broker reminded Truman that the building was insured for several million dollars, and Truman told an employee responsible for cleaning the building, "[I]f it ever caught on fire again, just get out. It is worth more to me down than it is standing." Similarly, when Truman's father-in-law said that leasing the building would be profitable, Truman responded that "it would probably make more money if it burnt."

By the fall of 2006, JMM was financially strapped. Unable to find tenants or buyers for the property, it faced mounting unpaid financial obligations totaling several thousand dollars, including a significant interest payment on one mortgage loan, due November 17, 2006—the same day that the insurance policy was set to expire—and a payment of $14,500 in broker fees associated with a second mortgage that Truman had personally guaranteed. After Truman negotiated three extensions of the deadline for the $14,500 payment, JMM's mortgage broker told Truman the week before the fire that the second loan would be canceled if the payment was not

3

made by November 14. Truman himself experienced significant financial difficulties relating to JMM and unrelated businesses, including a restaurant and a skating rink. He lost $97,000 in other real estate investments in 2005 and in September 2006 was forced to withdraw $135,000 from his retirement savings to pay credit card debts and JMM's bills. By early November 2006, Truman had less than $5,000 in his personal bank accounts. Nevertheless, the premium payments for the insurance policy covering the Liberty Street building remained up to date through November 17, 2006.

The building burned down the evening of November 12, 2006. Investigators soon determined that the fire was the result of arson. The following month, police arrested twenty-year-old Truman, Jr., who confessed that he had burned the building at his father's direction. Apparently unaware of his son's confession, Truman and his business partners filed an insurance claim for the building in February 2007. Truman was arrested by state law enforcement officials in March 2007, and both he and Truman, Jr. were indicted by a grand jury in Madison County, New York. Truman, Jr. pleaded guilty to third-degree arson pursuant to a cooperation agreement with the district attorney of Madison County and served a two-year term of imprisonment.

I. State Proceedings

Truman was first tried in state court on arson, fraud, and related charges, with Truman, Jr. as the main witness against him. The charges were dismissed, however, when the State prosecutors proved unable to corroborate Truman, Jr.'s testimony, as required under New York law when an accomplice testifies for the prosecution. See N.Y. Crim. P.L. § 60.22(1).

II. Federal Proceedings and Evidence at Trial

After the state charges against Truman were dismissed, the United States began its own investigation. In January 2010 Truman, Jr. entered into a cooperation agreement with the United States Attorney's Office pursuant to which he agreed to give "complete, truthful, and accurate

4

information during . . . statements [to the Government] and subsequent testimony before a federal grand jury and during subsequent proceedings," and acknowledged that a "failure or a refusal to continue to cooperate or to testify [would] constitute a breach of [the] agreement." Truman, Jr. testified before a federal grand jury, and soon thereafter Truman was indicted and charged with (1) aiding and abetting arson, in violation of 18 U.S.C. §§ 844(i) and 2 (Count One), (2) mail fraud, in violation of 18 U.S.C. § 1341 (Counts Two and Three), (3) use of fire in the commission of a felony, namely, mail fraud, in violation of 18 U.S.C. § 844(h) (Count Four), and (4) loan fraud, in violation of 18 U.S.C. § 1341, in connection with a second mortgage that Truman obtained to develop the Liberty Street property (Counts Five and Six).

A. Truman, Jr.'s Testimony and Statement to the Police

At Truman's federal trial, the Government called Truman, Jr. as a witness. He first testified about his criminal history, including the state arson conviction and various convictions for driving while intoxicated ("DWI").[1] He then testified that he burned down the Liberty Street building. While acknowledging that he had discussed the building with his father the day before the arson, Truman, Jr. declined to disclose what his father had told him. He testified that he started the fire at a time when Truman would be at the skating rink that he owned so that Truman would have an alibi. The day of the fire, Truman drove Truman, Jr. to the skating rink. There, Truman, Jr. met a friend, Nick Fleming, who drove Truman, Jr. to the Liberty Street building. Inside the building, Truman, Jr. located containers of gasoline and kerosene that Truman had previously purchased with cash and that had been left inside. He then piled cardboard boxes to ensure that the fire would reach each floor. Before setting the fire, he returned to the skating rink to pick up a black hooded sweatshirt that his father had obtained for him, and which he planned to

---

[1] Indeed, during the trial Truman, Jr. was serving a sixty-day prison term for failing to pay a fine in connection with a DWI conviction.

5

wear while setting the fire. After changing into the sweatshirt, Truman, Jr. entered the Liberty Street building, poured gasoline and kerosene from the containers onto wooden pallets, and lit them. After setting the fire, he first went to his father's restaurant to change out of his sweatshirt, called Fleming to tell him that he had set the fire, and then returned to the burning building, where he spotted his father and Fleming watching nearby. Truman, Jr. then went to his apartment with Fleming. His father met him there and helped him retrieve the sweatshirt. The two then drove to Syracuse, New York, where Truman, Jr. discarded the sweatshirt and his shoes in a dumpster.

When the Government asked Truman, Jr. why he set the fire and about the content of his conversations with his father, he refused to answer. The District Court confirmed that Truman, Jr. would not answer and warned him that his refusal would constitute a breach of the cooperation agreement with the Government. He still refused, saying, "I can't," and, "I can't do this." In response, and over Truman's objection, the Government read portions of Truman, Jr.'s testimony from Truman's state court trial, in which Truman, Jr. confirmed that his father had asked him to start the fire:

> [Question:] Jeffrey, did you have any information about the gasoline and kerosene before going over to the [building] that morning?
>
> Answer: Yes.
>
> Question: And from whom did you receive that information?
>
> Answer: My father.
>
> Question: And when did you receive that information?
>
> Answer: The night before.
>
> . . .
>
> Question: And what did your dad tell you about the gasoline and kerosene?
>
> . . .

Answer: Told me what room they were in and where in the room.

Question: What room were they to be in?

Answer: It was the room that had a previous fire in it.

. . .

Question: And did he tell you anything with regards for the purpose for those being there?

Answer: For burning the building down.

. . .

Question: And you said a week before [the fire] you had a discussion with your dad as well. What did he say to you at that time?

Answer: He asked me if I would do it.

After the testimony was read, Truman, Jr. confirmed that he had so testified during the state court trial.

On cross-examination, Truman's counsel asked Truman, Jr. about his deposition testimony in a related civil lawsuit that JMM had filed against the insurance company that denied JMM's insurance claim. Truman, Jr. acknowledged that he had refused to answer several questions and had invoked his Fifth Amendment right not to incriminate himself during the deposition, but he then proceeded to answer defense counsel's questions about peripheral matters relating to his state court testimony, and he maintained that his state court testimony had been truthful. He also acknowledged giving to the police the December 2006 written statement explicitly implicating his father in the arson, which was admitted into evidence, and he testified that the confession was true.

B. **Additional Government Evidence**

Several Government witnesses corroborated Truman, Jr.'s testimony regarding his father's involvement in the arson. Three days after the fire, Fleming heard Truman yell at Truman, Jr. to "keep your . . . mouth shut." In December 2006, in a series of recorded telephone calls that were admitted into evidence, Fleming told Truman that the police had found tracks from Fleming's car tires at the scene of the fire, that the police were looking for him and his car, and that he was concerned that they might find traces of gasoline and kerosene in the car's upholstery. Truman responded by offering to pay Fleming for the cost of replacing the tires. Shortly thereafter, Truman spoke with a police detective about the fire but concealed his conversation with Fleming. Ashley Shaughnessy, a friend of Truman, Jr., testified that after the arson Truman said "[t]hat they were going to take [Truman, Jr.'s] clothes and put them in the dumpster." Telephone and toll records further corroborated Truman, Jr.'s account of traveling to Syracuse with his father to dispose of evidence. In addition, the Government presented evidence, set forth above, relating to Truman's purchase of the building, the insurance policy, his conversations with JMM's real estate broker, and his inculpatory statements to a building employee and to his father-in-law.

After the Government's case-in-chief, Truman moved for a judgment of acquittal under Rule 29(a). The District Court granted the motion as to the loan fraud charges, Counts Five and Six, but reserved judgment as to the remaining four counts.

C. **The Defense Case**

The defense introduced some evidence that Truman, Jr. had recanted his state court testimony inculpating his father. In particular, Anthony LaFache, Truman, Jr.'s lawyer in the civil lawsuit between JMM and the insurance company, testified that Truman, Jr. invoked his

Fifth Amendment right not to answer questions during the civil deposition because he was concerned that his responses might conflict with his prior state court testimony. According to LaFache, Truman, Jr. confided "that his previous sworn testimony and previous sworn statements, blaming his father . . . were untrue."

Testifying in his defense, Truman denied any role in the arson or the related fraud. On cross-examination, an Assistant United States Attorney ("AUSA") repeatedly asked Truman whether statements made by other witnesses that contradicted Truman's testimony were "true," "accurate," or "mistaken," and whether certain witnesses were "lying" during their testimony. The AUSA also confronted Truman about his conversation with Fleming and, after noting that Truman had failed to mention it to police, asked: "[I]sn't it true that you would not tell [the detective] about this conversation you had with Fleming because he was a police officer and police officers, in your view, are the biggest liars on the planet[?]" After Truman answered no, the Government introduced deposition testimony from the JMM civil suit in which Truman stated, "Police are the biggest liars on the planet. Who knows what he is going to write down on a piece of paper[?] They all lie. They lied at my [state criminal] trial, and they lie all the time."

D. The Government's Rebuttal

On the Government's rebuttal case, Carrie Dailey testified that the summer before the fire, Truman arrived at Truman, Jr.'s apartment and began talking about the Liberty Street building. According to Dailey, "[h]e said to all the gentlemen in the room, you guys want to get in on burning the building down, you can get a cut of the insurance money. And then he looked directly at [Truman], Jr. and told him[,] you will be all set." Dailey, however, was not asked to identify Truman in the courtroom, and she admitted on cross-examination that she had failed to contact the police after the fire or after Truman was indicted.

9

## E. Jury Summations

During summation, an AUSA stated that Truman, Jr. had violated his plea agreement by refusing to testify directly against his father. The AUSA then dramatically tore a copy of the agreement in half, describing it as "breached," "over," and "void." The AUSA also addressed contradictions between Truman's testimony and, echoing the Government's cross-examination, asserted that Truman's main argument was that key Government witnesses were "mistaken or lying."

In its summation, the defense emphasized that the Government had not asked Dailey to identify Truman in the courtroom, noting that "[t]hese two [AUSAs] didn't just graduate from law school," and arguing that "[i]f she could have [identified Truman], she would have. She couldn't, and she didn't." In the Government's rebuttal summation, one of the AUSAs addressed his failure to ask Carrie Dailey to identify Truman in the courtroom: "Try as we can to be perfect and to remember everything, we can't. And I should have asked some witnesses some questions, and I didn't. And with Carrie Dailey, I didn't. . . . I should have, and I didn't. I apologize to you for that. But nobody is perfect." The Government also repeated its argument that, in order to believe Truman's testimony, the jury would have to believe that several of its witnesses had lied. The Government further described it as "telling" that Truman believed most police officers to be liars. Truman did not object to any of the Government's statements during summation.

## F. Verdict and Post-Trial Proceedings

The jury deliberated for less than a day before convicting Truman on all four of the remaining counts. Truman renewed his motion for a judgment of acquittal under Rule 29(a) or 29(c) and moved in the alternative for a grant of a new trial under Rule 33(a). The District Court

granted the Rule 29(a) motion after concluding that Truman, Jr.'s federal and state court trial testimony was "incredible as a matter of law." United States v. Truman, 762 F. Supp. 2d 437, 450 (N.D.N.Y. 2011). The court determined that the remaining circumstantial evidence was insufficient to support the arson and other charges. Id. at 448-49.

The District Court also conditionally granted Truman's motion for a new trial under Rules 29(d) and 33(a) on four grounds: (1) Truman, Jr.'s "patently incredible" testimony constituted an "exceptional circumstance[]" warranting a new trial, id. at 453; (2) it had erroneously admitted Truman, Jr.'s prior state court testimony because it was hearsay, irrelevant, unfairly prejudicial and misleading, id. at 454-57; (3) the Government had engaged in prosecutorial misconduct during its cross-examination of Truman and in its summations, id. at 458-64; and (4) these errors were not harmless because Truman, Jr.'s state court testimony was the only direct evidence of Truman's guilt, id. at 455, 464.

The Government appealed.

## DISCUSSION

### I. Rule 29 Judgment of Acquittal

#### A. Standard of Review

We have explained that on a motion for a judgment of acquittal, a district court must determine the sufficiency of the evidence supporting the guilty verdict, Fed. R. Crim. P. 29(a), and it must evaluate all of the evidence, including improperly admitted evidence, United States v. Cruz, 363 F.3d 187, 197 (2d Cir. 2004) (citing Lockhart v. Nelson, 488 U.S. 33, 39-40 (1988)). Under Rule 29(b), when a district court reserves decision on a defendant's Rule 29 motion at the close of the Government's evidence, "it must decide the motion on the basis of the evidence at the

11

time the ruling was reserved." Fed. R. Crim. P. 29(b). We review de novo a district court's grant of a judgment of acquittal, United States v. Coté, 544 F.3d 88, 98 (2d Cir. 2008), and on appeal we view the trial evidence in the light most favorable to the Government, United States v. Reyes, 302 F.3d 48, 58 (2d Cir. 2002). When a defendant has been prejudiced by improperly admitted evidence, the proper remedy is not a judgment of acquittal but a new trial. See, e.g., United States v. Bruno, 383 F.3d 65, 90 n.20 (2d Cir. 2004).

B. Double Jeopardy

As an initial matter, Truman argues that the Double Jeopardy Clause deprives us of jurisdiction to review the District Court's judgment of acquittal because Truman moved for the judgment before the jury's verdict. But the Double Jeopardy Clause does not bar our review of the District Court's judgment of acquittal because the District Court granted the motion after the jury's verdict. United States v. Autuori, 212 F.3d 105, 114 (2d Cir. 2000) ("The Double Jeopardy Clause presents no bar to the review of an acquittal based upon the insufficiency of the evidence and granted following a jury verdict of guilty."); see United States v. Hundley, 858 F.2d 58, 66 n.7 (2d Cir. 1988).[2]

C. Truman, Jr.'s Credibility

Rule 29 "does not provide the trial court with an opportunity to substitute its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury." United States v. Guadagna, 183 F.3d 122, 129 (2d Cir. 1999) (alteration in original and quotation marks omitted). "[T]he proper place for a challenge to a witness's credibility is in

_____

[2] The Government does not appeal the District Court's judgment of acquittal with respect to Truman's loan fraud charges, which was issued at the close of the Government's case-in-chief.

12

cross-examination and in subsequent argument to the jury," United States v. Roman, 870 F.2d 65, 71 (2d Cir. 1989) (quotation marks omitted), not in a motion for a judgment of acquittal. We have explained that even the testimony of a single accomplice witness is sufficient to sustain a conviction, provided it is not "incredible on its face," United States v. Florez, 447 F.3d 145, 155 (2d Cir. 2006), or does not "def[y] physical realities," Coté, 544 F.3d at 101 (quotation marks omitted).

The District Court determined that Truman, Jr.'s testimony in both the federal and state court trials was incredible as a matter of law based on a number of factors. It cited his role as an accomplice testifying under a cooperation agreement, his breach of that agreement and the Government's "effective[] repudiat[ion]" of his testimony, his criminal record and history of alcohol and drug abuse, his attorney's assertion that he had perjured himself in the state court trial testimony, his refusal during the federal trial to answer questions about his father's involvement in the arson, and Truman's consequent inability to cross-examine him concerning his out-of-court testimony. Truman, 762 F. Supp. 2d at 449-50, 457.

Although these factors surely impaired Truman, Jr.'s credibility, none of them rendered his testimony incredible as a matter of law. Assessing his credibility was the province of a jury properly instructed, as was the case here, on those aspects of his testimony that might bear on the question. See United States v. O'Connor, 650 F.3d 839, 855 (2d Cir. 2011) ("It is the province of the jury and not of the court to determine whether a witness who may have been inaccurate, contradictory and even untruthful in some respects was nonetheless entirely credible in the essentials of his testimony." (quotation marks omitted)); United States v. Santana, 503 F.2d 710, 716 (2d Cir. 1974). His failure to testify fully, as required under the cooperation agreement, his

13

troubled background, any inconsistencies in his testimony, "and the inferences to be drawn from the . . . evidence, are factors relevant to the weight the jury should accord to the evidence, and do not on this record justify the grant of a judgment of acquittal." Coté, 544 F.3d at 100.

D. Other Evidence of Guilt

Even aside from Truman, Jr.'s testimony, the remaining circumstantial and direct evidence of Truman's guilt in the Government's case-in-chief, viewed in the light most favorable to the Government, was sufficient to support the jury's verdict. First, Truman, Jr.'s signed confession to police directly implicated Truman.[3] Second, several witnesses established Truman's financial motive to destroy the Liberty Street building. Third, the evidence showed that the timing of the fire on November 12, 2006, was in Truman's financial interest, given the looming payment deadlines and expiration of JMM's insurance policy. Fourth, Truman's conversation with Fleming and Ashley Shaughnessy's testimony strongly suggested that Truman had facilitated the arson and was attempting to conceal his participation.

The evidence adduced in the Government's case-in-chief of Truman's participation in the arson, which the District Court recognized was an "essential element" of the other charges against

---

[3] The District Court did not abuse its discretion in first admitting that confession as providing context for a prior statement to the police made by Truman, Jr. in which he denied setting the warehouse fire. See Fed R. Evid. 106; United States v. Castro, 813 F.2d 571, 575-76 (2d Cir. 1987) ("Under [Rule 106], the omitted portion of a statement must be placed in evidence if necessary . . . to place the admitted portion in context, to avoid misleading the jury, or to ensure fair and impartial understanding of the admitted portion."). Truman, Jr., when questioned by the Government regarding this confession after its admission, then expressly stated that his statements in that confession were true. The consistency between Truman, Jr.'s statement at trial that the statements in his confession were true and the confession itself served to rebut the defense's effort to imply, in cross-examining Truman, Jr., that he had fabricated his father's involvement in the arson under pressure from law enforcement and the Government, rendering the confession admissible for its truth as a prior consistent statement under Federal Rule of Evidence 801(d)(1)(B).

him, was sufficient to support the jury's guilty verdict on Counts One through Four, each of which rested upon a finding that Truman had aided and abetted arson. Because that evidence, without Truman, Jr.'s testimony, was sufficient and, in any event, Truman, Jr.'s testimony was not incredible as a matter of law, the District Court's judgment of acquittal on these counts was error.

II. New Trial

The Government also appeals from the District Court's conditional grant of a new trial under Federal Rules of Criminal Procedure 29(d) and 33. We review a district court's grant of a new trial for abuse of discretion. United States v. Polouizzi, 564 F.3d 142, 159 (2d Cir. 2009) ("[Rule 33] confers broad discretion upon a trial court to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice."(quotation marks omitted)). A district court may grant a new trial "if the interest of justice so requires," Fed. R. Crim. P. 33(a), but it "abuses its discretion when its decision rests on an error of law or a clearly erroneous factual finding, or when its decision . . . cannot be located within the range of permissible decisions," United States v. Gonzalez, 647 F.3d 41, 57 (2d Cir. 2011).

When considering a motion for a new trial under Rule 33, a district court has discretion to "weigh the evidence and in so doing evaluate for itself the credibility of the witnesses." United States v. Sanchez, 969 F.2d 1409, 1413 (2d Cir. 1992) (quotation marks omitted). Even in cases involving a witness's perjured testimony, however, a new trial is warranted only if "the jury probably would have acquitted in the absence of the false testimony." Id. at 1413-14.

The District Court conditionally granted a new trial based on its view that (1) Truman, Jr.'s testimony was patently incredible, (2) Truman, Jr.'s state court testimony was improperly

15

admitted into evidence, and (3) the Government had engaged in prosecutorial misconduct during its cross-examination of Truman and in summation.  We address each of these issues in turn.

A. Truman, Jr.'s Credibility

Having already concluded that the District Court erred when it determined that Truman, Jr.'s state court testimony was incredible as a matter of law, we also conclude that the District Court exceeded its discretion when it granted a new trial on that basis.  See Gonzalez, 647 F.3d at 57.  Even aside from Truman, Jr.'s testimony, we cannot say that the jury probably would have acquitted Truman.  In particular, we note Carrie Dailey's rebuttal testimony, which the District Court disregarded because Dailey failed immediately to notify the police about Truman and because she was not asked to identify Truman at trial.  Truman, 762 F. Supp. 2d at 456-57.[4] These facts do not, standing alone, demonstrate a lack of credibility, particularly in the absence of any apparent motive to lie or any indication that Dailey would have been unable to identify Truman if asked to do so.  The jury was entitled to credit Dailey's testimony, and the District Court's decision to grant a new trial despite that strong evidence of guilt reflected a decision outside the "range of permissible decisions."  Gonzalez, 647 F.3d at 57.

B. Admissibility

The District Court also concluded that a new trial was warranted because Truman, Jr.'s state court testimony was inadmissible hearsay.  Truman, 762 F. Supp. 2d at 456.  We disagree.

---

[4] We do not read Federal Rule of Criminal Procedure 29(d), which provides for a conditional grant of a new trial upon grant of a judgment of acquittal after a guilty verdict, to incorporate Rule 29(b)'s restriction on the consideration of evidence admitted after the Rule 29 motion was made and while decision on the motion was held reserved.  Compare Fed. R. Crim. P. 29(b), with Fed. R. Crim. P. 29(d).  In determining whether to grant a new trial under Rule 33(a), therefore, the District Court was obligated to consider the testimony of Dailey, who was called as a rebuttal witness, as evidence that might support a guilty verdict.

16

A statement is nonhearsay if "[t]he declarant [(1)] testifies" at trial, "[(2)] is subject to cross-examination about a prior statement, and [(3)] the statement is inconsistent with the declarant's testimony and [(4)] was given under penalty of perjury at a trial, hearing, or other proceeding or in a deposition." Fed. R. Evid. 801(d)(1)(A) (section breaks omitted).

Truman, Jr. answered every question posed to him in cross-examination about his prior state court testimony, and therefore he was "subject to cross-examination" within the meaning of Rule 801(d)(1)(A). His prior testimony was also "inconsistent" with his refusal to answer questions about that testimony on direct examination at trial. In United States v. Marchand, we held that "if a witness has testified to . . . facts before a grand jury and forgets or denies them at trial, his grand jury testimony . . . falls squarely within Rule 801(d)(1)(A)." 564 F.2d 983, 999 (2d Cir. 1977). Our holding in Marchand naturally extends to a trial witness's refusal to answer questions posed and answered in prior sworn state court testimony. To the extent Marchand did not specifically address this issue, however, we now join all of our sister courts that have addressed the question in holding that where, as here, a witness who testifies under oath and is subject to cross-examination in a prior state court proceeding explicitly refuses to answer the same questions at trial, the refusal to answer is inconsistent with his prior testimony and the prior testimony is admissible under Rule 801(d)(1)(A). See, e.g., United States v. Iglesias, 535 F.3d 150, 159 (3d Cir. 2008) (refusal to testify with more than "one word admissions, evasive and rambling responses, and equivocations" inconsistent with "clear and straightforward" prior testimony); United States v. Matlock, 109 F.3d 1313, 1319 (8th Cir. 1997) (testimony that "attempted to minimize" defendant's role and that "was far less incriminating and therefore far less helpful to the government" inconsistent with prior testimony); United States v. Williams, 737

17

F.2d 594, 608 (7th Cir. 1984) ("limited, vague, and not inculpatory" testimony inconsistent with prior testimony). Our holding also coheres with a principal purpose of Rule 801(d)(1)(A), which is to protect against the "turncoat witness who changes his story on the stand and deprives the party calling him of evidence essential to his case." Fed. R. Evid. 801(d)(1)(A), Notes of Advisory Committee, 1972 Proposed Rules (quotation marks omitted).

Besides Rule 801(d)(1)(A), the District Court pointed to two alternative reasons for concluding that it had improperly admitted Truman, Jr.'s state court testimony. First, it explained that the Government failed to lay a "proper foundation" establishing that Truman, Jr.'s "refusal to answer was firm and unchangeable," Truman, 762 F. Supp. 2d at 454-55, as appears to be required under Federal Rule of Evidence 804(a)(2) as a precondition to considering a declarant unavailable for the purpose of admitting the declarant's hearsay statement under Federal Rule of Evidence 804(b). The District Court erred in reaching this conclusion, however, because the requirements of Rule 804 are irrelevant to determining whether testimony is admissible as nonhearsay pursuant to Rule 801, which was the basis for admitting Truman, Jr.'s prior testimony at trial. Second, the District Court determined that Truman, Jr.'s testimony was inadmissible because it could not "properly be credited" and therefore was irrelevant under Federal Rule of Evidence 402 and unfairly prejudicial or misleading under Federal Rule of Evidence 403. Truman, 762 F. Supp. 2d at 456-57. The court's conclusion, however, rested on the determination that Truman, Jr's testimony was incredible as a matter of law – a determination that we have already concluded was reached in error. The District Court therefore exceeded its discretion in granting a new trial on these bases as well.

## C. Prosecutorial Misconduct

Finally, the District Court conditionally ordered a new trial based on its view that the Government engaged in prosecutorial misconduct in cross-examining Truman and in summation and that the misconduct was not harmless. Although we agree that the Government engaged in some misconduct (a point the Government wisely conceded on appeal), we conclude that the misconduct did not deprive Truman of a fair trial and that a new trial was unwarranted given the strong evidence of guilt.

We turn first to the Government's cross-examination of Truman, during which it asked him to opine on the credibility of lay and law enforcement witnesses. "As a matter of law, the credibility of witnesses is exclusively for the determination by the jury, and witnesses may not opine as to the credibility of the testimony of other witnesses at the trial." United States v. Forrester, 60 F.3d 52, 63 (2d Cir. 1995) (alteration and quotation marks omitted). We have accordingly held that a prosecutor's repeated requests that a witness opine on whether his fellow witnesses were "mistaken or lying" may require the grant of a new trial. United States v. Richter, 826 F.2d 206, 208-09 (2d Cir. 1987).

Here, the Government improperly asked Truman whether lay witnesses for the Government were "mistaken or lying," and twice asked him if his son was "lying." Similarly, in summation, the Government referred to deposition testimony in which Truman said that all police officers were "liars" – testimony that may have been properly admitted for impeachment purposes – to improperly suggest that Truman's personal views of the police rendered his testimony less credible. In this regard, we find troubling the Government's remark that it was "telling" that Truman said "cops are the biggest liars on the planet," and its statement, coming on the heels of

19

references to Truman's testimony that certain lay witnesses were "mistaken or lying," that a police officer who contradicted Truman's testimony "must have been lying when he said expressly, clearly, nope, I asked him where he had been that night." It is generally acceptable to argue to the jury that to believe one witness means to disbelieve other witnesses, United States v. Shareef, 190 F.3d 71, 79 (2d Cir. 1999); see also United States v. Durrani, 835 F.2d 410, 424 (2d Cir. 1987), provided that in doing so a party does not mischaracterize trial evidence or rely on a witness's evaluation of the credibility of another, see United States v. Scanio, 900 F.2d 485, 493 (2d Cir. 1990), abrogated on other grounds by Ratzlaf v. United States, 510 U.S. 135, 136 n.1 (1994). Both of the Government's statements above, however, suggested, incorrectly, that Truman had accused law enforcement officers of lying in this case. See United States v. Universita, 298 F.2d 365, 367 (2d Cir. 1962) ("The prosecution has a special duty not to mislead; the government should, of course, never make affirmative statements contrary to what it knows to be the truth.").

The Government also misstepped when it asserted that Truman, Jr's cooperation agreement had been voided because he refused to testify directly against his father. In effect, the cooperation agreement provided that only the Government could elect to void it, but there was no evidence that the Government had exercised its right to do so. Accordingly, it was improper for the Government to inform the jury of this fact in summation.

In determining whether the Government's misconduct so substantially prejudiced Truman as to deprive him of a fair trial, we consider "[(1)] the severity of the misconduct, [(2)] the measures adopted to cure the misconduct, and [(3)] the certainty of conviction absent the misconduct." United States v. Elias, 285 F.3d 183, 190 (2d Cir. 2002). Here, the most significant

20

misconduct – the Government's suggestion that Truman had called a police officer a liar – was irrelevant to the central issue of Truman, Jr.'s credibility and unrelated to the other compelling evidence of guilt admitted at trial. Given the strong likelihood of conviction based on the evidence adduced at trial, we conclude that the Government's misconduct did not "cause the defendant substantial prejudice by so infecting the trial with unfairness as to make the resulting conviction a denial of due process," United States v. Parkes, 497 F.3d 220, 233 (2d Cir. 2007) (quoting Elias, 285 F.3d at 190), and was, when viewed "in the context of the entire trial," not "so severe and significant" as to deprive Truman of "a fair trial," United States v. Farhane, 634 F.3d 127, 167 (2d Cir. 2011) (quotation marks omitted). We therefore conclude that the District Court exceeded its discretion in granting a new trial on this basis.

The AUSA's comments regarding Truman, Jr.'s breach of the cooperation agreement concerned a discretionary decision that could have been freely made by the Government. Because the Government's decision to void the agreement had little or no connection to Truman's guilt and, if anything, was favorable to Truman, its misleading statements on this subject, while improper, can hardly be said to have substantially prejudiced the defendant.

Lastly, Truman also contends that the AUSA in rebuttal improperly stated that he "should have asked" Dailey to identify Truman but neglected to do so, and that he was not "perfect." The District Court concluded that these comments constituted "improper vouching" of Dailey's testimony. Truman, 762 F. Supp. 2d at 463. Again, we disagree. In context, the remarks did not express the AUSA's "personal belief or opinion as to the truth or falsity" of Dailey's testimony. United States v. Carr, 424 F.3d 213, 227 (2d Cir. 2005). Instead, they appropriately parried an attack by defense counsel on the Government's candor.

21

**CONCLUSION**

For the foregoing reasons, we VACATE the District Court's judgment of acquittal under Rule 29(a) and its conditional grant of a new trial under Rules 29(d) and 33(a), and we REMAND to the District Court with instructions to reinstate the jury's verdict and enter a judgment of conviction.