*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 12-CF-1797

DARWESHI MCROY, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF1-23783-11)

(Hon. William M. Jackson, Trial Judge)

(Argued October 21, 2014                    Decided January 15, 2015)

*Joshua Deahl*, Public Defender Service, with whom *James Klein* and *Alice Wang*, Public Defender Service, were on the brief, for appellant.

*Margaret E. Barr*, Assistant United States Attorney, with whom *Ronald C. Machen Jr.*, United States Attorney, and *Elizabeth Trosman*, *Elizabeth H. Danello*, *Sharon Marcus-Kurn*, and *Mervin Bourne*, Assistant United States Attorneys, were on the brief, for appellee.

Before FISHER, THOMPSON, and EASTERLY, *Associate Judges*.

FISHER, *Associate Judge*: After a jury trial, appellant Darweshi McRoy was

convicted of thirteen counts of first-degree and second-degree child sexual abuse

with aggravating circumstances.[1] On appeal, he argues that the trial court should not have allowed the government to "impeach" one of its own witnesses with a videotaped statement. In addition, he contends that the court should have granted a mistrial when a witness revealed that appellant had spent time in jail, and that the evidence was insufficient to support one of his convictions. For the following reasons, we affirm in part and reverse in part.

## I.     Factual and Procedural Background

### A.     Initial Allegations

From 2004 until 2010, appellant lived in a series of houses in the District of Columbia with A.J. and her ten children. During that time, appellant stayed at home to take care of the children while their mother worked. Appellant is the biological father of six of the children and stepfather to the remaining four.

In 2008, twelve-year-old D.J., one of appellant's stepdaughters, wrote in her diary that appellant had made her "hump him" in 2005 when she was nine. She

---

[1] D.C. Code §§ 22-3008, -3009, -3020 (2001).

later retracted that allegation in a signed statement to the police. Then, in May 2010, D.J. and M.J., another one of appellant's stepdaughters, told their mother that appellant had been touching them. She called the police, who told her to take the girls to the Bundy Child Advocacy Center (the "CAC"). Forensic interviewers at the CAC conducted separate, videotaped interviews of both girls on May 25, 2010. In part of her interview, D.J. described the first instance of abuse in 2005, where appellant forced her to sit on his lap and moved back and forth against her.

In her grand jury testimony on October 26, 2011, D.J. stated that what she said in her CAC interview was true. However, it does not appear from the record that the tape of that interview was played for the grand jury, or that it had been played for D.J. before she was asked to affirm the truth of statements she made seventeen months earlier.

On April 24, 2012, appellant was indicted on nine counts of first-degree child sexual abuse and eight counts of second-degree child sexual abuse. The indictment alleged that between July 2004 and May 2010, appellant sexually abused D.J., M.J., and two of their friends on numerous occasions. Each count identified a single victim and alleged a specific time period and type of sexual act.

For example, count two alleged that appellant touched M.J.'s breast sometime between 2005 and 2007.

## B.    Evidence at Trial

D.J., who was fifteen at the time of trial, was very reluctant to testify. She did not appear after being subpoenaed by the government, and marshals eventually brought her to the courthouse. After some introductory questions, the prosecutor asked D.J. about the first time appellant abused her. In response, she shook her head and said more than once that she did not want to talk about it, explaining that she did not "want to keep bringing it back up."

The government then asked D.J. if she had been interviewed at the CAC. D.J. responded that she had spoken to a lady at the CAC in 2010 and told the lady the truth. The government introduced the video of that interview over appellant's objection, and played the portion in which D.J. described the 2005 abuse. After viewing and listening to the recording, D.J. reaffirmed that everything she said in it was true. She did not give any further testimony about the first time appellant abused her, but did answer questions relating to at least four later instances of

abuse.  On cross-examination, she answered all the questions appellant's counsel asked her.

M.J., who was seventeen at the time of trial, testified that appellant abused her on numerous occasions between 2005 and 2010.  Among other things, she said that appellant had rubbed her breast on numerous occasions starting in 2009, after the family moved to a residence on Shepherd Street.

The mother of D.J. and M.J. also testified.  On direct examination, the government asked her a series of questions about periods of time when she was separated from appellant and had children with other men.  She testified that she had four children when she was separated from appellant, and that she and appellant had "started getting back involved with each other when he was released from jail in 2000."  That testimony prompted a motion for a mistrial, which was denied.

The jury convicted appellant of seven counts of first-degree and six counts of second-degree child sexual abuse.  Two of the original counts were dismissed at the government's request, and the jury deadlocked on the two remaining counts.

## II.  D.J.'s CAC Interview

Appellant first contends that it was error to admit D.J.'s videotaped interview at the CAC.  We review the trial court's evidentiary rulings for abuse of discretion.  *Diggs v. United States*, 28 A.3d 585, 594 n.11 (D.C. 2011).

## A.  Admissibility of the Video

The portion of D.J.'s CAC interview which described the abuse charged in count nine was admitted as substantive evidence at trial.  The government defends this ruling by relying primarily on D.C. Code § 14-102 (b)(1), which provides that a statement is not hearsay if (1) the declarant testifies at trial and is subject to cross-examination concerning the statement, (2) the statement is inconsistent with the declarant's testimony, and (3) the statement was made under oath.  Such a prior statement is substantive evidence.  D.C. Code § 14-102 (b) (2001).  As we understand the record, however, the trial court initially admitted the video only to impeach D.J.'s credibility and show her demeanor at the CAC.  It later allowed the tape to be treated as substantive evidence because, after the video was played in court, D.J. stated under oath that what she said there was true.  *See Williams v. United States*, 859 A.2d 130, 138 (D.C. 2004) (videotape of CAC interview

properly treated as substantive evidence because witness adopted those portions of the CAC video used to impeach her).

We put aside the precise basis for treating the videotaped statement as substantive evidence because both the statute and the common law rule require, as a preliminary matter, that the statement be inconsistent with the witness's testimony at trial. *See Perritt v. United States*, 640 A.2d 702, 706 (D.C. 1994) (noting common-law requirement that a prior statement be inconsistent with trial testimony before it can be used for impeachment). We ultimately conclude that the government did not satisfy this threshold requirement.

## 1. Refusal and Inconsistency

The parties vigorously contest whether D.J.'s trial testimony was inconsistent with her statements in the video. The government contends that D.J. refused to testify and that her refusal was inconsistent with the statements in her CAC interview. Appellant contends that because D.J. did not give any trial testimony related to the first time she was abused, there was no testimony for her prior statement to be inconsistent with. If anything, he argues, D.J.'s testimony was *consistent* with her CAC interview. Before the video was played to the jury,

D.J. affirmed the truth of her statements at the CAC and testified, without giving specific details, that appellant had touched her body. It is, of course, well-settled that "[p]rior consistent statements are generally inadmissible to support one's own unimpeached witness, because mere repetition does not imply veracity." *Battle v. United States*, 630 A.2d 211, 215-16 (D.C. 1993).

Is a refusal to testify about a certain subject inconsistent with a previous statement discussing that topic? There is case law on both sides of the issue. In this jurisdiction, and in many others, a witness's prior statement is considered inconsistent with her testimony if she evades questions at trial by claiming a loss of memory. *See Diggs*, 28 A.3d at 594 (holding that witness's prior grand jury testimony was inconsistent with his claimed loss of memory at trial). Several courts have extended this principle, holding that refusal to testify about an event has the same evasive effect as a claim of memory loss and thus is inconsistent with a witness's prior statements describing that event. *E.g.*, *United States v. Truman*, 688 F.3d 129, 142 (2d Cir. 2012) (holding that where "a witness who testifies under oath and is subject to cross-examination in a prior state court proceeding explicitly refuses to answer the same questions at trial, the refusal to answer is inconsistent with his prior testimony"); *United States v. Iglesias*, 535 F.3d 150, 159 (3d Cir. 2008) (holding that "when a witness who testifies frankly under oath

subject to cross-examination only two days later states that he now 'can't answer the question' and is otherwise evasive and vague, a district court may find that these statements are inconsistent"); *People v. Homick*, 289 P.3d 791, 828 (Cal. 2012) (comparing refusal to testify to claimed memory loss and holding that "a witness's refusal to answer may be materially inconsistent with prior statements, exposing the witness to impeachment").

In contrast, some courts have reasoned that a witness's refusal to testify is unlike a claim of memory loss because there is no current testimony to compare with the prior statement. *See Tyler v. State*, 679 A.2d 1127, 1132 (Md. 1996) (holding that the effect of witness's refusal to testify was "virtually the same as if [he] had not physically taken the witness stand," and if he "had not taken the stand, his prior testimony could not be deemed 'inconsistent'"); *Barksdale v. State*, 453 S.E.2d 2, 4 (Ga. 1995) (holding that government could not impeach witness with prior statement because he "refused to answer any questions and thus gave no testimony in court with which the prior statement could be judged to be inconsistent"); *State v. Williams*, 442 A.2d 620, 623 (N.J. Super. Ct. App. Div. 1982) (holding that witness could not be impeached with prior statement because his silence did "not constitute 'testimony'"). These courts therefore do not permit the use of a prior statement to impeach a witness who refuses to testify on the same

topic.  *See Tyler*, 679 A.2d at 1132-33; *Barksdale*, 453 S.E.2d at 4; *Williams*, 442 A.2d at 623.

"The common-law tradition is one of live testimony in court subject to adversarial testing . . . ." *Crawford v. Washington*, 541 U.S. 36, 43 (2004).  Thus, a strong preference for live testimony undergirds the rules of evidence.  *See Brooks v. United States*, 39 A.3d 873, 884 (D.C. 2012).  Generally, hearsay statements are not admissible at trial because they lack "indicia of reliability:  they are usually not made under oath or other circumstances that impress the speaker with the solemnity of his statements; the declarant's word is not subject to cross-examination; and he is not available in order that his demeanor and credibility may be assessed by the jury." *Jones v. United States*, 17 A.3d 628, 632 (D.C. 2011) (quoting *Laumer v. United States*, 409 A.2d 190, 194 (D.C. 1979) (en banc)).  Even when many of those concerns are ameliorated because the declarant testifies at trial, prior consistent statements of a witness are inadmissible for their truth unless they meet the requirements of D.C. Code § 14-102 (b)(1) because of "an unwillingness to countenance the general use of prior prepared statements as substantive evidence . . . ."  Fed. R. Evid. 801 (d)(1) advisory committee's note

(1972).[2]  Unless an out-of-court statement falls within one of the recognized exceptions to the rule against hearsay, it may not be used to supply the testimony of a witness.

## 2.  Did D.J. Refuse to Testify?

In this case we do not decide the more abstract question of inconsistency because we conclude that the government did not lay a sufficient foundation for admitting the video.  Even if we assume in the government's favor that an outright refusal to testify about an event may be deemed to be inconsistent with a prior statement discussing the same topic, we are not convinced on this record that the government and the trial court made sufficient efforts to determine whether D.J. could be persuaded to testify.   In other words, faced with a difficult witness, the government resorted too quickly to playing the video.  As the trial unfolded, this video statement, rather than live testimony, provided the only substantive evidence supporting count nine of the indictment.

---

[2]  Comparison to the federal rule is appropriate when interpreting D.C. Code § 14-102 (b)(2) because the statute "duplicates the almost identically worded Federal Rule of Evidence 801 (d)(1)(B)." *Worthy v. United States*, 100 A.3d 1095, 1097 (D.C. 2014).

At trial, D.J. initially testified as follows:

Q:  Do you know kind of what we're going to ask you to talk about today?

A:  Yes.

Q:  How do you feel about talking about those things?

A:  I don't want to talk about it.

Q:  Why don't you want to talk about it?

A:  It's disturbing.  I don't want to talk about it.

Q:  Did those things happen to you?

A:  Yes.

 . . . .

Q:  Okay.  Could you tell us what happened the first time it happened?

A:  (Shakes head)

Q:  You're shaking your head no.  Now, when you're shaking your head no, why can't you tell us?

A:  Because I don't want to talk about it.

Q:  Okay.  Did you – you don't want to talk about it. You don't want – but did it happen?

A:  Yes.

Q:  And why don't you want to talk about it?

A:  Because I don't want to keep bringing it back up.

Q:  Okay.  Were you asked about the very first time when you went and spoke to the lady in 2010?  All you have to do is say yes or no to that.

A:  Yes.

Q:  Did you tell her the truth?

A:  Yes.

The government then introduced the portion of D.J.'s CAC interview where she discussed the first instance of abuse, which occurred in 2005.

The government contends that D.J. was refusing to testify because she said four times that she did not want to talk about the abuse.  However, each time she did so, her answer responded to the question posed.  The first question was, "How do you feel about talking about those things?"  The second question was, "Why don't you want to talk about it?"  The third question was, "Now, when you're shaking your head no, why can't you tell us?"  And the last question was, "And

why don't you want to talk about it?" On one occasion the government asked D.J. to describe the first instance of abuse, and she shook her head in response. However, she was not again asked (much less directed) to describe that particular abuse. Neither the government nor the court made additional efforts to persuade D.J. to testify before the video was introduced.

A litigant has several options when faced with a reluctant or recalcitrant witness. For example, an attorney can urge the witness to testify. The attorney may also remind the witness that she is required to answer the questions, or ask the court to do so. Often an admonition from the trial judge will have a greater impact than the efforts of an attorney to coax testimony from a witness. As more serious leverage, the attorney may ask the court to hold the witness in contempt if she continues to refuse to answer questions. *See, e.g.*, *Martin v. United States*, 756 A.2d 901, 904 (D.C. 2000) (describing situation where trial court found witness in contempt for refusing to testify). If a party does not exhaust at least some of those options, it cannot fairly be said that the witness is refusing to testify. Moreover, the government may too readily (and happily) resort to the more convenient option of substituting a prior statement for in-court testimony if we do not require a record that firmly establishes that the witness is refusing to answer the questions.

Eliciting details of sexual abuse is a very delicate matter, and courts have given the government great leeway in presenting the testimony of a child victim. For example, as this record illustrates, leading questions are tolerated more readily, and lawyers customarily adopt a gentler tone. In the present context, moreover, we might not insist on all the coercive measures that would be appropriate if an adult was reluctant to testify. In this case, however, the government too quickly abandoned its examination of D.J. in favor of playing the video of her CAC interview.

We have no doubt that D.J. did not want to testify, at least about the first instance of sexual abuse. But the record discloses little effort to coax her to testify (and none to force the issue) before the video was introduced. And we are not persuaded that such efforts would have been futile. The initial questioning of D.J. starkly contrasts with the government's efforts to cajole her into testifying after the video was played. For example, when D.J. later gave an inaudible response, the prosecutor said, "We're going to get through this, I promise, but you need to help me. Okay? Okay? Because we're going to try and get you on and off today. Alright, [D.J.]? But we need your help. Okay?" At one point, the prosecutor approached the witness stand and urged, "I need you to answer me, I really do,

because otherwise we're just going to sit here, okay, and we promised you you're getting out today."

Appellant's trial counsel used similar techniques to persuade D.J. to answer questions, such as moving closer to D.J. and telling her to speak up. The court also became involved, instructing D.J. to answer questions or to raise her voice when appropriate. These efforts by the attorneys and the court succeeded, as D.J. eventually answered all the remaining questions posed to her on direct and cross-examination. We therefore conclude that the record does not establish D.J's outright refusal to testify.

Our reasoning aligns with the cases outside this jurisdiction where a witness's recalcitrance was found to be inconsistent with a prior statement. In those cases, the witness had firmly refused to testify. In *Homick*, for example, a witness refused to answer questions at trial as part of a "disruptive pattern of interjecting irrelevancies, . . . claiming lack of memory, sitting mute, and once in a while providing a responsive answer." 289 P.3d at 827. The trial court told the witness that "he had no right to refuse to answer questions and would be held in contempt for every question he refused to answer." *Id*. Only after the witness continued to refuse to testify did the court allow the government to impeach him

with his prior statements. *Id.*; *see also Truman*, 688 F.3d at 142 (allowing impeachment where witness explicitly refuses to answer questions at trial); *State v. Portee*, 740 A.2d 868, 874 (Conn. App. Ct. 1999) (allowing impeachment when witness continued to refuse to answer questions after twice being held in contempt).

In sum, even if we assume that a prior statement may be treated as inconsistent with a refusal to testify, this record does not establish that D.J. was adamantly refusing to testify. Thus, the government failed to meet the threshold requirement for admission, and allowing the government to play the video recording of D.J.'s statement at the CAC was an erroneous exercise of discretion. *See Johnson v. United States*, 398 A.2d 354, 364 (D.C. 1979) ("An informed choice among the alternatives requires that the trial court's determination be based upon and drawn from a firm factual foundation.").

## B.    Was Appellant Prejudiced?

We next turn to whether appellant's convictions should be reversed because a portion of D.J.'s CAC statement was played for the jury. *See Johnson*, 398 A.2d at 367 (a trial court abuses its discretion when there has been an erroneous exercise

of discretion *and* "the impact of that error requires reversal"). "We apply the *Kotteakos* harmless error standard in evaluating the impact of an erroneously admitted hearsay statement." *Jones v. United States*, 17 A.3d 628, 631 (D.C. 2011).[3] Under that standard, "reversal is not warranted if we determine, 'with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error.'" *Id.* at 634 (quoting *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)).

The jury ultimately convicted appellant of thirteen counts of child sexual abuse. Six of those counts related to M.J., five to D.J., and two to another victim, E.W. The jury was unable to reach a verdict on the two counts relating to the fourth victim, K.H. Appellant contends that the admission of D.J.'s CAC statement requires reversal of all of his convictions, asserting that, if it believed D.J.'s allegations of abuse, the jury was more likely to believe the testimony of the other victims.

---

[3] D.J. responded to questions on cross-examination, and appellant does not argue that he was deprived of his constitutional right to confront the witnesses against him. We therefore do not apply the more stringent constitutional harmless error test. *See Duvall v. United States*, 975 A.2d 839, 843 (D.C. 2009).

There is no doubt that we must set aside the conviction on count nine because the CAC video provided the only evidence of that abuse. We also agree that the other counts relating to D.J. should be reversed. D.J.'s testimony at trial was, at best, reticent and lacking in detail. As the trial court explained, when the prosecutor asked her questions on direct examination, she often covered her mouth or eyes, turned away, or stayed silent on the stand. When she did respond, most of her replies were one-word answers to leading questions.

Playing D.J.'s CAC interview likely bolstered her testimony at trial. D.J. mostly mumbled on the video, but, when repeated by the CAC interviewer, her answers provided a coherent narrative of the abuse in 2005. Perhaps more importantly, D.J. cried softly during a portion of the video, and this display of emotion probably had a bigger impact on the jury than her testimony in court. We therefore cannot say "with fair assurance" that the jurors were not swayed in their assessment of D.J.'s testimony by viewing the video.

However, we can say with the requisite assurance that D.J.'s interview did not substantially sway the jury's decision on the counts related to the other victims. As the trial court recognized, the central issue of the case was whether or not the jury believed the government's complaining witnesses. In effect, appellant argues

that if D.J.'s credibility was bolstered by playing the video, the credibility of the other witnesses would have been bolstered as well.

We disagree with that contention for three reasons. First, the victims testified as individuals, and the jury instructions focused on assessing the credibility of "any" witness or "the" witness. The jury's failure to come to a decision on the charges relating to K.H. shows that it separately evaluated the credibility of each victim. If the jurors had evaluated the testimony of the victims collectively, it is not likely they would have convicted on some charges while failing to come to an agreement on others. The verdicts show that the jury believed the testimony of D.J., M.J., and E.W., but was not persuaded by K.H.'s testimony.

Second, neither the video nor D.J.'s testimony corroborated the testimony of the other victims. The portion of the video played to the jury only described the first time appellant abused D.J. in 2005. It did not refer to his abuse of other children. D.J.'s in-court testimony contained only minimal references to appellant's abuse of the other victims. To the extent that D.J. testified about the other victims, her testimony was helpful to appellant. For example, she testified

that she had never seen appellant abuse M.J. while she and M.J. shared a room in a residence on Parkland Place.

Finally, the testimony from the other victims was much more compelling than D.J.'s testimony. M.J. testified in detail about several acts of sexual abuse appellant committed against her, tying each specific act to a certain location. E.W. likewise testified in detail about the two occasions when appellant touched her inappropriately.

The video was only mentioned twice in the government's closing arguments. Appellant contends that these references in rebuttal show that the video was essential to the government's entire case. In context, however, the video was mentioned only in relation to D.J. ("is it possible that that little girl could have made those emotions up?"). Any generalizations about the other victims were not specifically linked to the video. And appellant's counsel was able to argue, in line with the defense theory, that D.J. cried in her CAC interview because M.J. had "dragged [her] into this" and "pressured" her to fabricate the abuse.

We therefore conclude that the convictions relating to M.J. and E.W. were not substantially swayed by the improper admission of the video recording.

Accordingly, we affirm the eight convictions relating to the abuse of M.J. and E.W., but vacate the five convictions relating to the abuse of D.J.[4]

### III. Reference to Appellant's Time in Jail

Appellant contends that the trial court should have granted his motion for a mistrial after the mother of D.J. and M.J. mentioned that appellant "was released

---

[4] The government contends that because D.J. adopted the statements in her CAC interview after the video was played at trial, any error in admitting the video was harmless. It is true that "when a witness testifies under oath and adopts a prior statement not made under oath, that prior statement becomes substantive evidence." *Williams v. United States*, 859 A.2d 130, 138 (D.C. 2004) (quoting *Mercer v. United States*, 724 A.2d 1176, 1195 (D.C. 1999) (internal alteration omitted)). However, that doctrine requires that the prior statement be properly admitted in the first instance. *See, e.g.*, *Koonce v. United States*, 993 A.2d 544, 552-53 (D.C. 2010) (CAC video adopted at grand jury and admitted as substantive evidence at trial when properly admitted to impeach witness); *Williams*, 859 A.2d at 138 (CAC video admitted as substantive evidence at trial after properly used to impeach witness).

The statements in this case were initially admitted by the trial court as impeachment and demeanor evidence. As we have explained, the CAC tape should not have been admitted for impeachment purposes because the record does not establish that it contained prior inconsistent statements. Even if the tape was properly admitted to show D.J.'s demeanor, that would not permit the jury to consider what she said. *Cf. In re L.C.*, 41 A.3d 1261, 1263 (D.C. 2012) (testimony of witness about demeanor of victim under report-of-rape rule "properly includes 'only enough details to show that the complainant reported the sexual assault charged'" (quoting *Battle v. United States*, 630 A.2d 211, 223 (D.C. 1993)). Thus, the doctrine of adoption does not apply because the statements in this case were admitted improperly in the first instance.

from jail in 2000." The trial judge denied the motion, instead instructing the jury that "being in jail does not mean Mr. McRoy was convicted of any crime" and that "the law prohibits you from using that passing reference in any way whatsoever to determine whether the [g]overnment has proven beyond a reasonable doubt that Mr. McRoy is guilty of any of the charges in this indictment." "We will reverse a trial court's denial of a mistrial only where it 'appears irrational, unreasonable, or so extreme that failure to reverse would result in a miscarriage of justice.'" *Evans v. United States*, 12 A.3d 1, 7 (D.C. 2011) (quoting *Coleman v. United States*, 779 A.2d 297, 302 (D.C. 2001)).

Improper references to a defendant's criminal history, though potentially prejudicial, do not always warrant a mistrial. *See, e.g.*, *Dorsey v. United States*, 935 A.2d 288, 293-94 (D.C. 2007); *Goins v. United States*, 617 A.2d 956, 959 (D.C. 1992). The reference to appellant's having been in jail was brief and non-specific, and it was not intentionally elicited by the government.[5] The reference was not related to the credibility of the complaining witnesses, which was the

---

[5] Appellant contends that the government was at least reckless because its line of questioning was irrelevant to the issues at trial. However, the government did warn the witness not to refer to appellant's time in jail. We accept the trial court's finding that there was no government misconduct, although we reiterate "that it is the prosecutor's responsibility to take all reasonable steps to assure that government witnesses not disclose inadmissible and potentially prejudicial evidence to the jury." *Sparks v. United States*, 755 A.2d 394, 402 n.9 (D.C. 2000).

central issue at trial. Finally, the court issued a clear curative instruction, which we presume the jury followed, absent evidence to the contrary. *Harris v. United States*, 602 A.2d 154, 165 (D.C. 1992) (en banc). Under those circumstances, we hold that the trial court did not abuse its discretion in denying appellant's motion for a mistrial. *See Clark v. United States*, 639 A.2d 76, 79-80 (D.C. 1993) (reference to defendant's prior incarceration did not require a mistrial where there was no government misconduct, the prosecution's case was strong, and defendant's counsel rejected trial judge's offer of curative instruction).

## IV.   Sufficiency of the Evidence on Count Two

Appellant contends that there was insufficient evidence to convict him of the second-degree child sexual abuse described in count two of the indictment. "A court must deem the proof of guilt sufficient if, 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Rivas v. United States*, 783 A.2d 125, 134 (D.C. 2001) (en banc) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Here, appellant does not claim that the government failed to prove the elements of child sexual abuse, but rather that it proved a different offense from the one charged.

The jury was instructed that count two charged appellant with touching M.J.'s breast on numerous occasions between on or about August 1, 2005, and on or about November 30, 2007, when they lived at a residence on E Street in Northeast Washington.[6] This offense was described on the verdict form as "contact between the defendant's hand and [M.J.'s] breast on numerous occasions between on or about August 1, 2005 and on or about November 30, 2007 at the residence on E Street, NE."

At trial, however, M.J. testified that appellant did not touch her breast until the family moved to a residence on Shepherd Street, which other testimony indicated happened in 2009:

> Q:     Okay.  Has he ever touched you on your breast?
>
> A:     Yes.
>
> Q:     Where did that start happening, if you remember?

---

[6] The indictment itself did not mention the residence on E Street. However, the trial court was concerned that the jury might convict appellant without unanimously agreeing that a particular incident of abuse occurred. As a result, the parties agreed to include the location of each incident on the verdict form to ensure that the jury reached a unanimous decision as to each specific instance of abuse. The prosecutor agreed to supply this information.

A:     Shepherd Street.

Q:     Is it possible it started before Shepherd Street?

. . . .

A:     No.

There was no evidence from any source that appellant touched M.J.'s breast before the family moved to Shepherd Street.

We have recognized that "it is difficult for child witnesses to identify exact times, dates, and locations." *Williams*, 859 A.2d at 141. For this reason, we "have consistently given prosecutors and grand juries leeway in terms of the particularity required . . . in this kind of case," *Roberts v. United States*, 752 A.2d 583, 589 (D.C. 2000), and we have allowed the government to identify time periods by linking events to the locations where they occurred. *See, e.g.*, *Lazo v. United States*, 54 A.3d 1221, 1227 (D.C. 2012) (rejecting defendant's contention that the indictment was impermissibly vague when the "prosecutor added the exact location where the sexual conduct allegedly took place" during a six-month range of time). We have also recognized that "the phrase 'on or about' encompasses more than the days immediately before and after the date alleged in an indictment

or petition." *In re E.H.*, 967 A.2d 1270, 1274 n.6 (D.C. 2009). However, a conviction may only be sustained if the evidence establishes that the offense was committed on a date "reasonably close to the one alleged." *Id.* at 1275 (quoting *Ingram v. United States*, 592 A.2d 992, 1007 (D.C. 1991)).

Because we assume that the jury followed the court's instructions, *Harris*, 602 A.2d at 165, appellant was convicted of touching M.J.'s breast between 2005 and 2007 at E Street. However, the only evidence about that specific sexual act was that appellant touched M.J.'s breast after 2009 at Shepherd Street. The jury could not have reasonably inferred from M.J.'s unequivocal testimony that this conduct had happened at an earlier time and in a different place. *Compare In re E.H.*, 967 A.2d at 1274 ("Although the evidence presented at trial supports that *some* type of sexual abuse occurred at *some* unspecified time, the fact-finder would have had to speculate that there was anal penetration 'on or about' Saturday, January 29th."), *with Lazo*, 54 A.3d at 1230 (declining to reverse conviction for misdemeanor sexual abuse, but remanding for further analysis, where witnesses gave confusing or inconsistent testimony, but, "depending on the trial court's credibility determinations, the evidence was sufficient to support that the specific acts of sexual abuse detailed in the Information occurred during the six-month period noted in the Information.").

Because no reasonable jury could have found, as the government had charged, that appellant touched M.J.'s breast at the residence on E Street at a time reasonably close to the period between August 2005 and November 2007, the government failed to prove the particular sexual contact necessary to sustain that conviction. Accordingly, we reverse appellant's conviction for second-degree child sexual abuse on count two of the indictment.[7]

## V. Conclusion

---

[7] The government contends that appellant's argument is really "that the government constructively amended the indictment or impermissibly varied therefrom by failing to prove a fact asserted in the indictment." *Williams*, 859 A.2d at 141 (internal quotation marks omitted). We think, to the contrary, that the issue is properly analyzed as a failure of proof. However, even if we were to address the issue as the government suggests, we still would reverse. The difference between the facts alleged (as to both time and location) and the evidence adduced was too great to be dismissed as non-prejudicial. *Compare Pace v. United States*, 705 A.2d 673, 677-78 (D.C. 1998) (no prejudicial variance when indictment charged offense occurred on or about the month of April, and evidence at trial established that offenses occurred during a five-month period between late December and late May), *with id.* at 680 (Mack, J., dissenting) ("We have never accepted a variance of time of several months between indictment allegation and proof at trial as being not critical.").

The convictions on counts seven through eleven and count two are reversed.

The remaining convictions are affirmed.

*It is so ordered.*